[Crim. No. 24441. June 27, 1988.]

In re GREGORY ULAS POWELL on Habeas Corpus.

**COUNSEL**

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Ann K. Jensen, Martin S. Kaye and Dane R. Gillette, Deputy Attorneys General, for Appellant.

Robert H. Philibosian and Ira Reiner, District Attorneys (Los Angeles), Harry B. Sondheim, Donald J. Kaplan, Patrick Moran and Richard W. Gerry, Deputy District Attorneys, Stapleton & Nachlis, Marvin B. Nachlis, Christoper N. Heard and Kent S. Scheidegger as Amici Curiae on behalf of Appellant.

Dennis P. Riordan, under appointment by the Supreme Court, and Riordan & Rosenthal for Respondent.

Martin K. Maurer as Amicus Curiae on behalf of Respondent.

## Opinion

**MOSK, J.**—Today we are called upon to determine (1) the standard of review to be applied to a parole date rescission by the Board of Prison Terms (BPT or board)[1] and (2) the sufficiency of the evidence in the present case when viewed in light of that standard.

In 1977 the BPT granted petitioner Gregory Ulas Powell a 1983 parole release date. About one year before Powell was to be released, the BPT rescinded the parole date. After exhausting his administrative remedies, Powell sought a writ of habeas corpus. The superior court, applying the independent judgment standard of review, concluded the rescission was not supported by cause and granted the writ. As will appear, we reverse the order of the superior court.

## I. Facts

### A. *Powell's History*

Powell was convicted of first degree murder and sentenced to death for the 1963 murder of a Los Angeles police officer. After the judgment was reversed (*People* v. *Powell* (1967) 67 Cal.2d 32 [59 Cal.Rptr. 817, 429 P.2d 137]), he was retried and again convicted and sentenced to death. The sentence was later modified to life imprisonment. (*People* v. *Powell* (1974) 40 Cal.App.3d 107 [115 Cal.Rptr. 109].)[2]

During the early years of his imprisonment,[3] Powell participated in numerous escape attempts and other disciplinary violations. Thus in January

---

[1] The BPT and its predecessors, the Adult Authority and the Community Release Board, are collectively referred to herein as the BPT.

[2] The facts of the offense are briefly summarized: Two plainclothes Los Angeles police officers stopped Powell and Jimmy Lee Smith because the license plate light on Powell's car was not working. Powell drew a gun, disarmed the officers, and ordered them into his car. At Powell's direction, one of the officers drove toward Bakersfield and eventually down a remote road in Kern County. Powell told the officers he was going to free them. When they stopped and everyone got out of the car, Powell asked one of the officers if he had heard of the "Little Lindbergh" law. When the officer said yes, Powell shot him in the mouth. The other officer fled; Powell and Smith pursued him, but he escaped and notified authorities. Police arrested Powell early the following morning driving a stolen car. (See *People* v. *Powell, supra,* 67 Cal.2d 32; *People* v. *Powell, supra,* 40 Cal.App.3d 107.)

[3] We refer to Powell's imprisonment following his arrest in this case. He also spent all but a few of the years between 1949 and 1963 in federal or state institutions serving sentences for

1967, he obtained hacksaw blades and sawed through the bars of his cell at San Quentin; he eluded officers for several hours before being recaptured. Six months later, while Powell and Smith awaited transfer to Los Angeles for retrial, a guard intercepted notes from Powell to Smith relating to a plan to escape from Los Angeles County jail. In June 1968, while Powell was proceeding in propria persona at the retrial in Los Angeles, a woman acted as his runner to bring him legal documents and supplies. He persuaded her to smuggle guns into the jail; she was apprehended delivering a typewriter in which three loaded guns were hidden.[4] In April 1969, still in Los Angeles, Powell and five other inmates obtained a contraband tool and removed the screws holding a large metal plate over a day room window that opened onto the street. Investigating officers found a file and part of a hacksaw blade secreted behind the plate. There were a number of other disciplinary infractions while Powell was on death row.

Following his release from death row to the general prison population in 1972, Powell ceased being a problem inmate. He received favorable reports concerning his handling of money in the prison canteen, his ability to cope with incidents of hostility, and his success in dealing with stressful questioning from the media. His psychiatric reports stated he had improved substantially and was continuing to improve. The record indicates his good conduct has continued to the present time.

B. *The BPT's Actions*

In 1977 the BPT held a parole consideration hearing and granted Powell a June 1983 parole release date under the Indeterminate Sentence Law. It held a second hearing in 1979 under the Uniform Determinate Sentencing Act, and on that occasion granted him a 1986 release date. Since the earlier of the two dates was controlling, his release date remained that set by the first panel. The BPT held progress hearings in 1979 and 1980, and ultimately advanced his parole date to June 13, 1982.

In April 1980, Powell was transferred from San Quentin to the California Medical Facility at Vacaville, where he was evaluated by a correctional counselor. The counselor's report, in contrast to earlier favorable psychiatric reports, expressed doubt about his suitability for parole. The report stated that although his antisocial personality was "seemingly" improved,

---

other criminal offenses. At the time of the murder he was on parole after serving time for a marijuana offense; he admitted to having committed 35 to 40 grocery and liquor store robberies during that period.

[4] As a result of this incident, investigators were able to determine that the hacksaw blades in the January 1967 incident at San Quentin had also been smuggled into the prison in Powell's typewriter, which had been sent out for repairs.

his behavior and potential for violence could be unpredictable in stressful situations.

In response to the counselor's report, the BPT postponed a scheduled progress hearing and sought additional information. At the board's request, Vacaville staff psychiatrist Dr. Wilson Yandell interviewed Powell and prepared a report. The report supported his parole. Yandell stated that Powell's psychiatric condition had "improved greatly," that his previous impulsive and unstable behavior had become "less and less characteristic with maturation and change," and that he was likely to hold his psychiatric gains after release into the community. Yandell conceded that psychiatrists could not reliably predict an inmate's potential for violence after release; nevertheless, he stated that Powell's psychiatric improvement, strong personal support system, and plans for a structured lifestyle reduced the likelihood that he would engage in violent behavior if paroled.

One month after Dr. Yandell filed his report, the movie, *The Onion Field,* depicting Powell's crime, aired on national television. At a progress hearing shortly thereafter, the BPT received communications from the Governor of California, the District Attorney of Los Angeles, and the Los Angeles City Council, opposing Powell's scheduled parole. At the conclusion of the hearing the BPT scheduled a rescission hearing to consider: (1) psychiatric evaluations as to Powell's violence potential if released; (2) five attempted escapes or escape-related incidents between 1967 and 1969; and (3) two allegations of sexual misconduct in 1978.

At the rescission hearing, the BPT learned that previous hearing panels had investigated and rejected the two allegations of sexual misconduct. The first matter, based on a letter by former guard Gravitt, had been rejected by the earlier panels after the deputy warden, acting on the results of his own investigation, removed the report from Powell's file.[5] The second matter had also been rejected when the prior panels found no evidence of sexual misconduct. On learning of the earlier investigations and conclusions, the board determined it would not consider these matters further.

The BPT considered two additional psychiatric reports at the rescission hearing. The first, prepared by a team of six psychiatrists and five psychologists at the Northern Outpatient Clinic, favored rescinding Powell's parole. The group did not interview Powell, but thoroughly reviewed his extensive case file. According to the report signed by Chief Psychiatrist Diane Sutton, M.D., the staff unanimously concluded that significant doubt remained

---

[5] Gravitt did not claim to have observed actual misconduct, but only circumstances suggesting misconduct might have occurred. When the deputy warden investigated, he received conflicting stories from the prison staff.

regarding Powell's ability to adjust successfully on parole and to refrain from engaging in violent acts or reverting to a criminal lifestyle. The report opined that his improvements, made in an institutional setting, might well be superficial and "not likely to hold once he is released from confinement."

The Sutton report expressed three specific concerns. First, it stated that the Gravitt letter raised questions "about the stability and good influence of [Powell's] family."[6] Second, the report asserted that Powell's employment plans—especially in light of his lack of job experience or vocational training—were likely to subject him to considerable stress when he attempted to earn a living.[7] Finally, the report expressed concern that no follow-up work regarding possible brain damage had been done since 1964, three years after it was determined Powell had suffered brain atrophy.[8] In this connection the report recommended that extensive psychological testing and neurological evaluation be completed prior to any parole.

Dr. Sutton testified that her group did not strongly disagree with Dr. Yandell's earlier more positive report. The difference in viewpoint, she stated, was primarily a result of her group having had access to certain information—i.e., the reports of sexual misconduct and the parole investigation report on Powell's employment prospects—that Dr. Yandell had not seen. She stated the report would have been more positive had her group not assumed the sexual allegations were true; she did not, however, say that the group would have supported parole under those circumstances.

The second report before the BPT, prepared by Vacaville Chief Psychiatrist Dr. Edward South, favored Powell's parole. After examining Powell, interviewing his therapist, and studying his file, Dr. South concluded that his violence potential had decreased over time. He stated that Powell showed an increased empathy for and tolerance of others, an improved ability to make rational decisions, and a greater capacity to deal with emotional stress. These factors, according to Dr. South, enhanced "the favorable aspects of the prognosis already set forth on previous reports." He

---

[6] Gravitt's allegations involved members of Powell's family.

[7] The group based its conclusion in part on a recent parole investigation report. The report stated that Powell intended to enter the dog grooming business, but that (1) no such business presently existed and (2) Powell had neither training nor experience in dog grooming. Although Powell's wife once operated a dog grooming business with her former husband, at the time of the hearing she was working as a waitress and cook and receiving welfare support.

[8] Dr. Sutton testified that brain damage, particularly when coupled with intoxication, tends to lower one's inhibitions to impulsive behavior; in a person with an antisocial character disorder, this can lead to violent outbursts. The record indicates that since last being examined for brain damage Powell has suffered two potentially damaging head injuries. The first occurred when he was knocked unconscious during a boxing match; the second occurred when he was struck in the head with a stool and rendered unconscious during an altercation with another inmate.

emphasized, however, that psychiatric prediction of violence is subject to significant limitations due to the lack of meaningful comparative data. Dr. South did not recommend further neurological evaluation, because he felt Powell had shown no symptoms indicative of neurological change since his original tests.

The BPT ordered Powell's parole rescinded for two reasons. First, it found that the Sutton report raised significant doubt about his violence potential. The board recognized that the Yandell and South reports supported his release, but stated that the reports' acknowledged inability to predict his behavior limited their persuasiveness in light of the Sutton report's valid concerns. Noting his history of violence, his diagnosis of character disorder, and the possibility of undetected brain trauma, the BPT concluded there was a substantial likelihood he would pose a danger to others if released.

Second, the BPT found that the 1977 and 1979 hearing panels committed fundamental error resulting in the improvident granting of parole to Powell. It reached this conclusion after finding that the prior panels considered only perfunctorily Powell's 1967 attempt to escape from San Quentin, and failed completely to consider either the 1968 gun smuggling incident or the 1969 attempt to escape from Los Angeles County jail.

The BPT dismissed the allegations of sexual misconduct, and provided for a parole consideration hearing within six months. It recommended that in the interim Powell be evaluated for potential dangerousness and for his likelihood of maintaining psychiatric gains in an unstructured setting. It also recommended that a thorough neurological evaluation, as recommended in the Sutton report, be completed during that period.

## II.  DISCUSSION

### A.  *The BPT's Authority*

█    The BPT is the administrative agency authorized to grant parole and fix release dates. (Pen. Code, § 5075 et seq.; *In re Fain* (1976) 65 Cal.App.3d 376, 389 [135 Cal.Rptr. 543] (*Fain I*); *In re Schoengarth* (1967) 66 Cal.2d 295, 304 [57 Cal.Rptr. 600, 425 P.2d 200].)[9] The BPT is also empowered to rescind a parole date for cause. (*Fain I, supra,* 65 Cal.App.3d at pp. 388-394; *In re Fain* (1983) 139 Cal.App.3d 295, 302 [188 Cal.Rptr.

---

[9] The BPT assumed all the powers and duties of its predecessors, the Adult Authority and the Community Release Board. (See Pen. Code, § 5078, subd. (a).)

653] (*Fain II*); see Pen. Code, §§ 3041.5, 3041.7; Cal. Code Regs., tit. 15, § 2450.)

Cause for rescission may exist if the BPT reasonably determines, in its discretion, that parole was "improvidently granted" under the circumstances that appeared at the time of the grant, or that may have appeared since. (*Fain I, supra,* 65 Cal.App.3d at p. 394.) Section 2451 of title 15 of the California Code of Regulations enumerates matters that must be reported to the BPT and are grounds for rescission. (See *Fain II, supra,* 139 Cal.App.3d at p. 304; cf. *Fain I, supra,* 65 Cal.App.3d at pp. 392-394.) Subdivision (a) of section 2451 lists assorted disciplinary conduct such as assaults and attempted escapes. Subdivision (b) specifies that "psychiatric deterioration" is a ground for rescission when a prisoner's "mental state deteriorates to the point that there is a substantial likelihood that the prisoner would pose a danger to himself or others when released . . . ." Subdivision (c) provides that rescission can be based on "[a]ny new information which indicates that parole should not occur. Examples include: an inability to meet a special condition of parole, such as failure of another state to approve an interstate parole; information significant to the original grant of parole was fraudulently withheld from the board; or fundamental errors occurred resulting in the improvident granting of a parole date."

■ The BPT's discretion in parole matters has been described as "great" (Falk, *The Supreme Court of California 1971-1972* (1973) 61 Cal.L.Rev. 273, 427-428) and "almost unlimited" (Note, *The California Adult Authority* (1972) 5 U.C. Davis L.Rev. 360, 368, 376-377). The BPT's exercise of its broad discretion "involves the deliberate assessment of a wide variety of individualized factors on a case-by-case basis, and the striking of a balance between the interests of the inmate and of the public." (*Fain I, supra,* 65 Cal.App.3d at p. 389.)

Although broad, the board's discretion is not absolute. That discretion, including the discretion to determine whether a parole date should be rescinded, is subject to the prisoner's right to procedural due process. (*In re Prewitt* (1972) 8 Cal.3d 470, 474 [105 Cal.Rptr. 318, 503 P.2d 1326]; *Fain I, supra,* 65 Cal.App.3d at p. 394.) The board's decision must have a factual basis, and may not be based on "whim, caprice, or rumor." (*In re McLain* (1960) 55 Cal.2d 78, 87 [9 Cal.Rptr. 824, 357 P.2d 1080].) Moreover, although public outcry may properly trigger reconsideration of a parole-granting decision and an inquiry into whether the decision was an abuse of discretion, the board may not rely on public outrage to rescind parole. (*Fain II, supra,* 139 Cal.App. 3d at p. 310.) Nevertheless, it is the province of the board to resolve conflicting evidence in hearings before it. (*In re Carroll* (1978) 80 Cal.App.3d 22, 31 [145 Cal.Rptr. 334].)

B. *Standard of Review*

This court has not had occasion to specify the precise standard of review for parole rescission proceedings. Powell contends the trial court should apply its independent judgment to the facts before the BPT; in the alternative, he contends the substantial evidence test should apply. The People urge that even the substantial evidence test is too rigorous, and that parole rescissions should be upheld if there is "some evidence" supporting the decision.

■    We note initially that habeas corpus is a proper remedy to test the propriety of proceedings before the board. (*In re Streeter* (1967) 66 Cal.2d 47, 49 [56 Cal.Rptr. 824, 423 P.2d 976].) However, although the hearing on an order to show cause is generally a proceeding in which issues of fact bearing on the petitioner's claim to relief are decided (see *In re Hochberg* (1970) 2 Cal.3d 870, 873-876, fns. 2, 4 [87 Cal.Rptr. 681, 471 P.2d 1]), the court in a habeas corpus proceeding does not generally review the BPT's factual determinations de novo (see *In re Carroll, supra,* 80 Cal.App.3d at pp. 29-31).

Powell argues for the independent judgment standard of review by analogizing habeas corpus proceedings to administrative mandate proceedings under Code of Civil Procedure section 1094.5. That section provides for review of administrative orders or decisions; in some circumstances it specifies the independent judgment standard of review, in others the substantial evidence standard. If the former, an abuse of discretion is established when the court, exercising its independent judgment, determines the administrative findings are not supported by the weight of the evidence. If the latter, the court must accept all the evidence favorable to the respondent as true and disregard any unfavorable evidence; if the evidence so viewed is sufficient as a matter of law, the order or decision must be affirmed. (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384]; see *Campbell* v. *Southern Pac. Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121].)

Powell's analogy clearly fails.    ■    Even assuming administrative mandate were applicable, the independent judgment standard would not apply to parole rescissions. That standard applies only when an administrative decision affects a vested right. (See, e.g., *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144-146 [93 Cal.Rptr. 234, 481 P.2d 242].) A prison inmate has no vested right in his prospective liberty on a parole release date. (*Fain I, supra,* 65 Cal.App.3d at p. 390; see *In re McLain, supra,* 55 Cal.2d 78, 87.)

■    We turn, then, to the question whether a parole rescission must be supported by substantial evidence or merely by "some" evidence. California

case law, although sparse on this subject, suggests the latter. As stated above, the BPT enjoys broad but not absolute discretion in parole-related matters. (See *In re Stanworth* (1982) 33 Cal.3d 176, 181 et seq. [187 Cal.Rptr. 783, 654 P.2d 1311]; *In re Rodriguez* (1975) 14 Cal.3d 639, 651-653 [122 Cal.Rptr. 552, 537 P.2d 384].) Like its predecessors, it is "not required to proceed with the formality required of the courts." (*Matter of Application of Stanton* (1915) 169 Cal. 607, 609 [147 P. 264].) In the only California case specifically addressing the present question, the Court of Appeal rejected the "standard sufficiency of the evidence rule" and held that a parole rescission was an abuse of discretion only when the authority acted "without information, fraudulently, or on mere personal caprice." (*In re Spence* (1974) 36 Cal.App.3d 636, 639-640 [111 Cal.Rptr. 782].) We agree with this conclusion.

We are guided by the United States Supreme Court's decision in *Superintendent v. Hill* (1985) 472 U.S. 445 [86 L.Ed.2d 356, 105 S.Ct. 2768]. The *Hill* court, considering the standard of review for a prison disciplinary board's revocation of good time credits, held that procedural due process was satisfied as long as there was "some evidence to support the findings made in the disciplinary hearing." (*Id.* at p. 457 [86 L.Ed.2d at p. 366].) The court stated that "[t]he fundamental fairness guaranteed by the Due Process clause does not require courts to set aside decisions of prison administrators that have some basis in fact. Revocation of good time credits is not comparable to a criminal conviction [citation], and neither the amount of evidence necessary to support such a conviction [citation] *nor any other standard greater than some evidence* applies in this context." (*Id.* at p. 456 [86 L.Ed.2d at p. 365], italics added.)

The same reasoning applies in the present context. A parole date, like a good time credit, is a prospective benefit that is conditioned on the inmate's continued good performance and subject to review and withdrawal for cause by the BPT. While the board cannot rescind a parole date arbitrarily or capriciously, it does not abuse its discretion when it has some basis in fact for its decision. As stated above, the BPT must strike "a balance between the interests of the inmate and of the public." (*Fain I, supra,* 65 Cal.App.3d at p. 389.) If it is to accomplish this delicate task, it must operate with broad discretion and not be "subject to second-guessing upon review." (*Superintendent v. Hill, supra,* 472 U.S. at pp. 454-455 [86 L.Ed.2d at p. 365].) Accordingly, we hold that due process requires only that there be some evidence to support a rescission of parole by the BPT.[10]

---

[10]Lest there be confusion on the point, we stress that our holding in no way diminishes a prisoner's established right to procedural due process protections in a parole rescission hearing. (See *In re Prewitt, supra,* 8 Cal.3d at pp. 473-474.) We further observe that although there is "no significant distinction" between parole rescission and parole revocation for

C. *Evidence in the Present Case*

█ The BPT's decision to rescind Powell's parole must thus be upheld if supported by some evidence. We have no difficulty finding such evidence in the record.

In determining that doubt had been raised about Powell's ability to refrain from violence if released, the board relied primarily on the Sutton report and Dr. Sutton's testimony. The report's conclusions were based in part on an assumption that the Gravitt letter's allegation of sexual misconduct was true. Thus the question arises whether the Sutton report was so tainted by its reliance on the Gravitt letter that it could not be relied on by the BPT.

It is indisputable, of course, that the board could not have based its rescission on the Gravitt allegation without giving Powell an opportunity to confront and cross-examine witnesses. (See *Morrisey* v. *Brewer* (1972) 408 U.S. 471, 488-489 [33 L.Ed.2d 484, 495-499, 92 S.Ct. 2593]; *In re Prewitt, supra,* 8 Cal.3d at pp. 473-474.)[11] However, the board did not rely on the accusation as a basis for rescission; on the contrary, it expressly dismissed that issue. The question remains, however, whether the board could properly rely on the Sutton report.

The People argue that although the BPT could not consider the Gravitt letter, Dr. Sutton and her staff could do so. They rely on Evidence Code section 801, subdivision (b), which permits an expert to testify to an opinion based "on matter . . . made known to him at or before the hearing, *whether or not admissible,* that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Italics added.) The rule does not permit such testimony, however, when an expert is "precluded by law from using such matter as the basis for his opinion." (*Ibid.*) But even if we assume arguendo that the rules of evidence were applicable in the BPT's proceedings and that the Gravitt allegation was an improper basis for the Sutton report's conclusions, it does not follow that the board was required to disregard the entire report.

First, while the court may exclude opinion testimony based in whole or significant part on matter that is not a proper basis for such an opinion, it is

---

purposes of establishing a prisoner's right to procedural due process protections (*id.* at p. 474), we do not today hold that the "some evidence" standard of review necessarily applies to revocations of parole after release.

[11] Officer Gravitt never reported the incident as a "rule violation," and no disciplinary hearing was ever held on the charge. (See Cal. Code Regs., tit. 15, § 3312 et seq.) As mentioned above, the reference in Powell's file to this accusation has been removed.

not *required* to do so absent an objection. (Evid. Code, § 803.) At the hearing before the board, Powell made no such objection either to the Sutton report or to Dr. Sutton's testimony. Second, even if such an objection had been made and sustained, Dr. Sutton could have testified to that portion of the report that was based on proper matter. (*Ibid.*; see *People* v. *Coleman* (1985) 38 Cal.3d 69, 90 [211 Cal.Rptr. 102, 695 P.2d 189].) Thus, the board was undoubtedly free to consider the portions of the Sutton report that were *not* based on the Gravitt allegation; and if those portions provided some evidence to support the board's decision, we need look no further.

Dr. Sutton and her staff based their conclusions on much more than just the Gravitt letter. As stated above, they thoroughly reviewed Powell's extensive file, and considered, among other things, the parole investigation report on Powell's employment prospects. Powell's file, which included his complete medical and correctional history, provided the basis for the group's concern regarding Powell's violence potential due to possible neurological damage. The parole investigation report provided a valid basis for the group's concern about the level of personal stress Powell was likely to experience if released. Certainly, then, the portions of the Sutton report based on these two sources constituted some evidence to support the BPT's decision.

In sum, while the evidence was unquestionably in conflict, the resolution of that conflict and the weight to be given the evidence was for the board. (*In re Carroll, supra,* 80 Cal.App.3d at p. 31.) Since its determination had a factual basis, the board did not abuse its discretion in rescinding Powell's parole.[12]

The order of the superior court is reversed with directions to deny the writ of habeas corpus.

Lucas, C. J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I dissent.

There is no substantial evidence to justify the rescission of Gregory Powell's parole date. The majority, however, say that substantial evidence is not necessary; any evidence will do to uphold the decision of the Board of Prison Terms (BPT). Since substantial evidence is legally defined as evi-

---

[12] Accordingly, we need not consider the BPT's finding that the 1977 and 1979 panels committed fundamental error resulting in the improvident granting of parole dates.

dence that will persuade a reasonable person, the majority's decision means that evidence which would persuade only the unreasonable is sufficient to deprive a prisoner of his grant of parole. This is a holding with which I cannot agree.

But in this case even the majority's insubstantial evidence test fails. The evidence here does not show any misconduct or psychological deterioration after the parole date was fixed, but at best raises doubts about Powell's health and career plans. Such doubts may justify postponing parole until they are resolved, but cannot justify rescission. One cannot help but suspect that the BPT's decision here is not the product of impartial adjudication, but an emotional reaction to the prospect of parole for a once notorious prisoner whose notoriety was revived by the showing of a movie depicting his crimes.

The BPT is the administrative agency authorized to grant parole and fix release dates. (Pen. Code, §§ 5075 et seq., 3040 et seq.) Under the indeterminate sentence law (ISL), the BPT exercises wide discretion in fixing an inmate's term and setting his parole date. While a prisoner eligible for parole has the right to apply therefor and to have his application duly considered, he has no right to a parole at any fixed time or at all. The decision to grant or deny parole is committed entirely to the judgment and discretion of the BPT. (*In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200]; see *In re Stanworth* (1982) 33 Cal.3d 176, 181 et seq. [187 Cal.Rptr. 783, 654 P.2d 1311]; *In re Rodriguez* (1975) 14 Cal.3d 639, 651-653 [122 Cal.Rptr. 552, 537 P.2d 384]; *People* v. *St. Martin* (1970) 1 Cal.3d 524, 538 [83 Cal.Rptr. 166, 463 P.2d 390].) The only limitations placed upon the BPT's authority are that it must file a written definitive statement of its reasons to deny parole and that it may not in fixing the term and denying parole impose an excessive sentence disproportionate to the offense, which constitutes cruel and unusual punishment under our state Constitution. (*In re Rodriguez, supra,* 14 Cal.3d 639, 651 et seq.; *In re Sturm* (1974) 11 Cal.3d 258, 273 [113 Cal.Rptr. 361, 521 P.2d 97].) Under the determinate sentence law (DSL), the BPT's discretion has been narrowed to some extent, but it still remains broad. (See *In re Stanworth, supra,* 33 Cal.3d 176, 180 et seq.)

In 1977, the BPT granted Powell a June 1983 parole release date. The record showed that although Powell had attempted escapes and engaged in other misconduct, his conduct had changed dramatically when he was released from death row to the general prison population. He not only complied with the regulations but became an exemplary prisoner. There were numerous favorable prison staff reports concerning his work handling money and managing the prison canteen, dealing with incidents of hostility

by other inmates, and dealing with the media under stressful questioning. By fixing the parole date six years in advance, the BPT provided for continued monitoring of Powell's conduct. That monitoring revealed that there was no misconduct and that Powell's conduct continued to be outstanding. While some might feel that the enormity of Powell's crimes required more than 20 years incarceration as punishment, it was within the BPT's discretion to determine that 20 years was appropriate punishment. The BPT's 1977 determination must be upheld as valid, and may be rescinded only on valid grounds.

The BPT may rescind a parole date but only for cause. (Pen. Code, §§ 3041.5, 3041.7; *In re Fain* (1983) 139 Cal.App.3d 295, 302 [188 Cal.Rptr. 653]; Cal. Code Regs., tit. 15, § 2450.) Section 2451 of title 15 of the California Code of Regulations enumerates matters which must be reported to the BPT and which are grounds for rescission. Subdivision (a) lists assorted disciplinary conduct such as assaults and attempted escapes. Subdivision (b) specifies: "Psychiatric Deterioration. Any prisoner whose mental state deteriorates to the point that there is a substantial likelihood that the prisoner would pose a danger to himself or others when released and who is within 90 days of release shall be reported to the board." Subdivision (c) provides: "Any new information which indicates that parole should not occur. Examples include: an inability to meet a special condition of parole, such as failure of another state to approve an interstate parole; information significant to the original grant of parole was fraudulently withheld from the board; or fundamental errors occurred resulting in the improvident granting of a parole date."

The majority fail to recognize that, in contrast to its broad discretion to grant or deny parole, the BPT's discretion under the ISL in redetermining sentence and in rescinding parole has been limited. Thus in *In re McLain* (1960) 55 Cal.2d 78, 87 [9 Cal.Rptr. 824, 357 P.2d 1080], the court concluded that "good cause" must exist for an order redetermining sentence and rescinding parole and a convicted person's liberty may not be made to turn upon mere whim, caprice, or rumor. (*In re Fain* (1976) 65 Cal.App.3d 376, 394 [135 Cal.Rptr. 543]; *In re Spence* (1974) 36 Cal. App.3d 636, 639-640 [111 Cal.Rptr. 782].) Although *McLain* held that notice and hearing were not required for redetermination of sentence or for rescission of parole (55 Cal.2d at p. 85), subsequent cases have imposed notice and hearing requirements.

In *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593], it was concluded that parole *revocation* involved a conditional liberty interest and that due process required procedural protections in parole revocation proceedings, including written notice of the claimed violations of

parole, and opportunity to be heard in person and to present witnesses and documentary evidence, and a neutral hearing body.

In *In re Prewitt* (1972) 8 Cal.3d 470 [105 Cal.Rptr. 318, 503 P.2d 1326], we held that the *Morrissey* procedures were applicable in parole *rescission* proceedings as well as parole revocation proceedings. We reasoned: "Although the proceedings of which petitioner complains were not for revocation of parole but for rescission of an unexecuted grant of parole, we can perceive no significant distinction between the deprivation of the right to conditional liberty enjoyed by a parolee after release and the deprivation of the right to achieve such liberty after a grant thereof but before the date fixed for release. In either event the parolee has been deprived of a valuable if limited right to be free (see *Morrissey* v. *Brewer, supra,* 408 U.S. at p. 482 [33 L.Ed.2d at pp. 494-495]; *People* v. *Vickers, supra,* [8 Cal.3d] p. 451 [105 Cal.Rptr. 325, 503 P.2d 1313]), and the same or substantially the same protection must be accorded him in effecting that deprivation. An inmate, accordingly, is entitled to a hearing which substantially conforms to the *Morrissey* procedures on the question whether an order granting parole should be rescinded as improvidently granted." (8 Cal.3d at p. 474.)

In parole revocation proceedings the substantial evidence rule has been applied (*In re Gomez* (1966) 64 Cal.2d 591, 595 [51 Cal.Rptr. 97, 414 P.2d 33]; *In re Carroll* (1978) 80 Cal.App.3d 22, 30-31 [145 Cal.Rptr. 334]), and in accordance with the reasoning of *Prewitt,* we should adopt the same rule for parole rescission proceedings. The potential deprivation of an inmate's right to obtain conditional liberty precludes any lesser standard than a substantial evidence test.

The primary authority relied upon by the majority, *Superintendent* v. *Hill* (1985) 472 U.S. 445 [86 L.Ed.2d 356, 105 S.Ct. 2768] and its reliance on *Wolf* v. *McDonnell* (1973) 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963], require application of the substantial evidence test. Shortly after our decision in *Prewitt, supra,* 8 Cal.3d 470, the United States Supreme Court recognized in a situation somewhat analogous to the rescission of parole that a prisoner's liberty interest is sufficiently embraced within Fourteenth Amendment liberty to entitle him to minimum protections "to insure that the state-created right is not arbitrarily abrogated." (*Wolf* v. *McDonnell, supra,* 418 U.S. 539, 557 [41 L.Ed.2d 935, 951].) In *Wolf,* the court was concerned with disciplinary proceedings resulting in the deprivation of a prisoner's good time credits, a liberty interest substantially equivalent to that involved in a rescission of parole. The court reasoned that the interest in liberty parallels the accepted due process analysis as to property. (*Id.* at pp. 557-558 [41 L.Ed.2d at p. 952].)

In *Superintendent* v. *Hill, supra,* 472 U.S. 445, the court reaffirmed the view that revocation of good time credits involves an important liberty interest. The court also held that revocation does not comport with the minimum requirement of procedural due process unless the findings of the prison disciplinary board are supported by some evidence in the record. (472 U.S. at p. 454 [86 L.Ed.2d at p. 364].) Pointing out that the requirements of due process are flexible depending on a balancing of interests, the court held that the prisoner's interest must be accommodated in the distinctive setting of a prison where the disciplinary proceedings take place in a closely, tightly controlled environment peopled by those who have chosen to violate the criminal law and where the institutional needs include assuring the safety of inmates and prisoners, avoiding burdensome administrative requirements that might be subject to manipulation, and preserving the disciplinary process as a means of rehabilitation. (*Id.* at pp. 454-455 [86 L.Ed.2d at p. 364].) Recognizing that prison disciplinary proceedings take place in a highly charged atmosphere, and "prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances," the court concluded that fundamental fairness guaranteed by the due process clause does not require a standard of review greater than some or any evidence, an insubstantial evidence standard. (*Id.* at p. 456 [86 L.Ed.2d at p. 365].)

Under the substantial evidence test, the basic rule is that the evidence is sufficient if the determination made on the basis of it is one that could be made by reasonable people. (See, e.g., 8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs, § 265, p. 892.) A lesser test obviously suggests approval of some determinations which would not be made by reasonable people.

*Wolf* v. *McDonnell, supra,* 418 U.S. 539, and *Superintendent* v. *Hill, supra,* 472 U.S. 445, do not support the majority's insubstantial evidence test but require the substantial evidence test here. Under those cases, it is clear that the justification for permitting review on the basis of an any evidence or insubstantial evidence test is the distinctive setting of prison disciplinary proceedings involving exigent circumstances. It follows that when such considerations are absent the ordinary substantial evidence standard must be applied as it is in property cases. Although a discipline issue of possible sexual misconduct was originally part of the instant proceedings, the issue was excluded by the BPT. The remaining issues and the findings of the BPT are not based on disciplinary matters and do not involve exigent circumstances warranting departure from the substantial evidence rule. The latter rule should apply to the issues remaining before the BPT to avoid the danger of arbitrary action inconsistent with the statutes and administrative regulations limiting the BPT's authority to rescind parole. The potential

loss of the constitutionally protected liberty interest, absent exigent circumstances which are not involved here, requires we observe the rule of law and require the BPT to act reasonably, only on the basis of substantial evidence.

I turn then to an evaluation of the evidence offered and the findings of the BPT. The BPT ordered rescission of parole because it found sufficient doubt had been raised by the Sutton report regarding Powell's ability to refrain from further violent acts to warrant rescinding his parole. Although recognizing that the Yandell and South reports were supportive of release, the BPT pointed out that the reports stated that psychiatric prediction of future violence is severely limited and that Dr. South felt that any prediction in Powell's case would be speculative. The panel rejected Dr. South's statements to the effect that Powell would handle stress not too differently from other men released on the streets because Dr. South was unable to predict with certainty that Powell would be able to maintain psychiatric improvements under stress. The BPT concluded that public protection mandated more extensive testing and psychiatric intervention prior to release.

Thus, the BPT in the present proceeding relied upon the Sutton report. The Sutton report relied largely upon the Gravitt letter and its implications of sexual misconduct. Those allegations led the Sutton report not only to question Powell's stability but also the stability of his family relationship. Because the BPT previously rejected the claims of misconduct and in the instant hearing excluded consideration of the sexual misconduct allegations involved in the Gravitt letter, the rescission may not be based on those allegations.

As we have seen, under *Morrissey, supra,* 408 U.S. 471, and *Prewitt, supra,* 8 Cal.3d 470, the inmate is entitled to be heard and to present witnesses and documentary evidence. To hold that the BPT could exclude from consideration the alleged issues of sexual misconduct and then rescind parole based on evidence as to those issues would violate the due process rights guaranteed by *Morrissey* and *Prewitt.*

Although recognizing that the BPT refused to consider the allegations of sexual conduct and subsequently dismissed the issues relating to sexual conduct, the Attorney General argues that reliance on the Sutton report was not thereby precluded. While other parts of the Sutton report might properly be relied upon by the BPT, the portion relating to sexual conduct could not properly be given any weight.

"Those parts of an opinion that are based in whole or significant part on matter that is not a proper basis must be excluded upon objection, though

the expert may testify to that portion of the opinion which is based on proper matter. (Evid. Code, § 803.)" (*People* v. *Coleman* (1985) 38 Cal.3d 69, 90 [211 Cal.Rptr. 102, 695 P.2d 189].) *Coleman* recognized that opinions based on hearsay are admissible and that hearsay may be admissible in some cases to explain the opinion and to cross-examine the expert. (*Id.* at pp. 90-92.) Accordingly, the fact that the Sutton report was based on reports of others does not preclude its admission or preclude reliance upon it.

However, an expert opinion obviously is not entitled to any weight insofar as it is based on factual assumptions which are false. Although the record may not establish that there was no sexual misconduct as a matter of law, under the circumstances of the instant case the Gravitt letter must be deemed totally discredited. The allegations contained therein had been rejected by the deputy warden when after an investigation he removed the report from the file. Twice the BPT investigated those charges and rejected them. In the instant proceeding, although originally providing that the alleged sexual incidents would be inquired into, the BPT in the midst of the hearing announced that they would not be considered, and its order dismissed the sexual allegations. By excluding the issue of the truth or falsity of the sexual allegations, the BPT precluded any reliance on those matters by it or by experts.

Apart from the sexual matters, there is nothing in the Sutton report which would warrant rescission of parole. The majority rely on the neurological test recommendation and the employment report. (Maj. opn., *ante*, p. 906.) The employment problem conceivably might warrant some delay until other plans are established, but it did not warrant rescission.[1] Similarly, at most, neurological reevaluation might warrant a delay until the results were obtained. The reevaluation did not warrant rescission; only negative results could do so. The Sutton report did not assert that there was brain atrophy or that it was likely there was brain atrophy. It only noted a 20-year-old report of possible brain atrophy and that there had been no follow-up testing. Dr. South disagreed with the recommendation for further testing, noting the absence of any symptoms over so many years. In addition, it should be pointed out that Dr. Sutton indicated general agreement with Dr.

---

[1] In addition, it should be recognized that the employment report had additional defects. The Sutton report's objection to the employment plan was based on two matters, first family instability based solely on the Gravitt letter—a matter which must be rejected as shown above. Thus, the Sutton report insofar as it criticized Powell's engaging in a business with his wife must be rejected. Second, Powell had not received any vocational training in prison and had little work experience prior to prison. However, the report entirely ignores the prison records of Powell's extensive experience in prison of handling money and managing the prison canteen and of working for the prison administration. Apparently, the file available to Dr. Sutton did not include the prison staff reports.

Yandell's favorable report claiming that the difference in viewpoint was based on the additional information, which was the Gravitt report and the employment plan.

I conclude that the record is devoid of any competent evidence to show any disciplinary misconduct (Cal. Code Regs., tit. 15, § 2450, subd. (a)), or any psychiatric deterioration following the granting of the parole date (*id.*, subd. (b)). There is *no* proper evidence showing disciplinary conduct or psychiatric deterioration. Further, the record is devoid of any substantial new evidence as to prior conditions warranting rescission. Accordingly, whether we apply substantial evidence review or an insubstantial or any evidence review, there is no basis for the rescission of parole.

It should also be pointed out that the BPT applied an erroneous standard in rejecting the Yandell and South reports. The BPT rejected them because the doctors were unable to predict with certainty that Powell would be able to maintain psychiatric improvements under stress. Application of that standard would mean that inmates who committed violent crimes could never be paroled because, while psychiatrists may give opinions as to the lack of likelihood of future violence (see *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1026-1029 [245 Cal.Rptr. 185, 750 P.2d 1342]), they have recognized the inaccuracy of attempts to forecast future violent behavior. (See *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 768 et seq. [175 Cal.Rptr. 738, 631 P.2d 446].) Application of the certainty standard would furnish a shield for the BPT to act arbitrarily, aware that orders rescinding parole could never be overturned. While it is true that the BPT must consider the violence potential of parolees, the required guaranties of certainty of nonviolent behavior impose too high a standard.

Reasonable people can disagree whether given the enormity of Powell's crimes the 20-year incarceration was a sufficient penalty. The BPT concluded in 1977 that this was sufficient penalty, recognizing Powell's exemplary conduct and fixing the parole date six years in advance during which Powell would be observed to determine whether he engaged in any improper conduct, whether his exemplary conduct continued, and whether there was any psychological deterioration. The BPT's 1977 determination was valid and must be upheld. His exemplary conduct continued, and there is nothing in the record apart from the discredited Gravitt letter, which the majority does not rely upon, to indicate any misconduct on Powell's part or any psychological deterioration. The television program depicting Powell's crimes may have furnished a reason to scrutinize Powell's conduct, but it does not furnish grounds for rescinding the parole date. In the absence of any evi-

dence, substantial or insubstantial, to show that Powell engaged in improper conduct or that there was psychological deterioration, we can only speculate whether the television program was the basis of the BPT's action in rescinding parole. In any event, it is clear that in rescinding parole, the BPT acted contrary to the statutes and administrative regulations regulating its authority.

I would affirm the order of the superior court.