95 Cal.Rptr.2d 279 (2000)
80 Cal.App.4th 409
In re Robert ROSENKRANTZ, On Habeas Corpus.
C.A. Terhune, as Director, etc., et al., Petitioners,
v.
The Superior Court of Los Angeles County, Respondent;
Robert Rosenkrantz, Real Party in Interest.
Nos. B132370, B138635.
Court of Appeal, Second District, Division One.
April 27, 2000.
Rehearing Denied May 23, 2000.
Review Denied July 12, 2000.[*]
*280 Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Paul D. Gifford, Senior Assistant Attorney General, Darrell L. Lepkowsky, Supervising Deputy Attorney General, Rita Lane Medellin and Robert D. Wilson, Deputy Attorneys General, for Petitioners.
*281 No appearance for Respondent Superior Court.
Rowan K. Klein, for Respondent Robert Rosenkrantz and Real Party in Interest.
MIRIAM A. VOGEL, J.
In 1986, Robert Rosenkrantz was convicted of second degree murder, with a gun use allegation found true. He was sentenced to state prison for a term of 15 years to life, plus 2 years for his use of a gun. Following a series of hearings at which Rosenkrantz was found "unsuitable" for parole, he filed a petition for a writ of habeas corpus in which he asked the superior court to compel the Board of Prison Terms to find him suitable for parole. Over the Board's opposition, the superior court granted Rosenkrantz's petition on the ground that there was no evidence to support the Board's findings of unsuitability. The superior court ordered the Board to hold a new hearing and later issued other orders in furtherance of the enforcement of the earlier orders. The Board of Prison Terms filed an appeal, and later filed a petition for a writ of mandate. In substance, we affirm.

FACTS
The Circumstances of the Offense. Robert Rosenkrantz graduated from high school on June 21, 1985. That night, he hosted a party at his parents' beach house. Rosenkrantz's brother (Joseph) and Joseph's friend (Steven Redman), acting to confirm their suspicion that Rosenkrantz was homosexual, went to the beach house, surreptitiously watched through a window for about an hour, then burst into the house, screaming "faggots" and attacking Rosenkrantz and his friends. In the ensuing melee, Rosenkrantz's nose was broken. The next day, Joseph and Redman (knowing that Rosenkrantz did not want his parents to discover their son's homosexuality) told Rosenkrantz's parents that Rosenkrantz was gay. Rosenkrantz asked Joseph and Redman to tell Rosenkrantz's parents that it had all been a joke. Joseph agreed but Redman refused.
Rosenkrantz's father ordered him out of the house, and Rosenkrantz slept in his car that night. He was devastated. His father hated homosexuals, and they lived in a community where gays were considered "fair game," a view shared by Joseph and Redman. The next day (Monday), Rosenkrantz practiced his shooting at a firing range. He purchased an Uzi, which he picked up on Wednesday. On Thursday evening, Rosenkrantz parked in front of Redman's residence and slept in his car. On Friday morning, when Redman came out of his house, Rosenkrantz confronted Redman, displayed the Uzi, and demanded that Redman retract the statements he had made to Rosenkrantz's parents. Redman refused, laughed, and called Rosenkrantz a "faggot." Rosenkrantz shot Redman 10 times, then drove off.
Three weeks later, Rosenkrantz turned himself in to the police. He was charged with first degree murder. In 1986, a jury expressly acquitted him of first degree murder but found him guilty of second degree murder (and found true an allegation that he had personally used a firearm). Rosenkrantz was sentenced to state prison for a term of 15 years to life plus two years. We affirmed his conviction. (People v. Rosenkrantz (1988) 198 Cal. App.3d 1187, 244 Cal.Rptr. 403.)
The June 1996 Parole Suitability Proceedings. Rosenkrantz was received by the Department of Corrections in 1986. His first parole hearing was held in December 1994, and his minimum parole eligibility date was fixed at January 23, 1996. (Pen.Code, §§ 3040 [the Board of Prison Terms has the power to allow prisoners serving indeterminate sentences "to go upon parole outside the prison walls and enclosures"], 3041 [in the case of prisoners except those serving terms of life without the possibility of parole, the Board of Prison Terms "shall normally set a parole release date" one year prior to the prisoner's *282 minimum eligible parole release date].)[1] Rosenkrantz's next parole suitability hearing was held in June 1996, at which time the Board of Prison Terms hearing panel (Commissioners Ron Koenig and Manuel Guaderrama, and Deputy Commissioner Patricia Cassady) found Rosenkrantz suitable for parole and recommended a release date for the reasons set out in the margin.[2] In August, the Decision Review Unit (comprised of Commissioners Thomas Giaquinto and Arthur Van Court, and another commissioner) disapproved the recommended action for the reasons set out in *283 the margin.[3] As a result, no parole date was set.
The December 1996 Parole Suitability Proceedings. A rehearing was held in December 1996. At that time, the panel had before it a letter from Sergeant William P. McComas, the Sheriffs Department Homicide Bureau detective who had conducted the 1985 investigation. Excerpts from that letter, which explain the discrepancies noted by the Decision Review Unit, are set out in the margin.[4] Commissioner Van Court, a member of the Decision Review Unit panel that disapproved the earlier suitability recommendation based on "additional information," was a member of the rehearing panel. The other members were Commissioner John Gillis and Deputy Commissioner Mike Douglas. When Rosenkrantz's lawyer questioned the propriety of Commissioner *284 Van Court's participation, counsel was told there was no conflict because the Decision Review Unit had not decided whether "the prisoner was suitable for parole," and had reviewed only "the administrative portion" of the prior proceedings. (See § 2250 [a prisoner is entitled to a hearing by an impartial panel].) For the reasons set out in the margin, the rehearing panel found that Rosenkrantz was not suitable for parole.[5]
The August 1997 Parole Suitability Proceedings. Another hearing was held on August 7, 1997. The members of the panel were Commissioners Van Court, Giaquinto (who, with Van Court, had sat on the Decision Review Unit that disapproved Rosenkrantz's earlier grant of parole), and Carol Bentley. Commissioner Giaquinto presided. In addition to the information presented for the previous hearings, the August 1997 panel had before it a current recommendation for parole from Rosenkrantz's correctional counselor,[6] a June 1997 "Psychological Council Evaluation for the Board of Prison Terms" that was wholly favorable to Rosenkrantz,[7] and several *285 letters of support.[8] Through a representative, District Attorney Gil Garcetti informed the Board that he was "not opposed to this man receiving a parole date." There was no negative information presented.[9] For the reasons set out in the margin, the panel concluded that Rosenkrantz was not suitable for parole.[10]
*286 August 1998 Parole Suitability Proceedings. Another suitability hearing was held on August 18, 1998. Commissioner Giaquinto was on the panel again, this time joined by Commissioner Manuel Ortega and Deputy Commissioner Cassady. By a vote of two to one (the dissenter was Deputy Commissioner Cassady), Rosenkrantz's request for a suitability finding was again denied.[11] Presiding Commissioner Ortega stated the decision this way: "[T]he Panel has reviewed all the information received from the public and has determined that you're not suitable for parole. You would pose an unreasonable risk of danger to society. The number one reason was the offense was carried out in a manner which exhibits a callous disregard for the life and the suffering of another. These conclusions are drawn from the Statement of Facts where the prisoner laid in wait for the victim to come out.... He confronted him and, during the course of the confrontation, an argument ensured [sic ] and the victim was subsequently shot ten times...." (Emphasis added.) Deputy Commissioner Cassady then explained her reasons for finding Rosenkrantz suitable for parole; after which Commissioner Giaquinto explained his reasons for joining with Commissioner Ortega.
At the conclusion of the commissioners' remarks, Rosenkrantz's lawyer expressed concern that "some Commissioners, either consciously or subconsciously, [were] trying this man as a first degree...." Commissioner Giaquinto interrupted to say, "We're not here to do that." Presiding Commissioner Ortega said, "We're going to go off the record now," then denied counsel's request to remain on the record. There were no further recorded proceedings.[12]
The Habeas Corpus Proceedings. Meanwhile, in June or July 1998, Rosenkrantz had filed a petition for a writ of habeas corpus in which he sought review of the parole suitability decisions made in December 1996 and August 1997. The Board of Prison Terms answered. The petition was put over from time to time and ultimately heard after the August 1998 hearing at which Rosenkrantz had once again been found unsuitable. In March *287 1999, the superior court granted Rosenkrantz's habeas corpus petition and ordered the Board of Prison Terms to set a date commensurate with Rosenkrantz's conviction of second degree murder. The superior court's findings and reasons were stated in a 17-page opinion, excerpts of which are set out in the margin.[13]
*288 The Board of Prison Terms sought reconsideration. On April 30, after a further hearing, the superior court issued a modified order directing the Board of Prison Terms that, "[u]nless there are changed circumstances or new information ... that was not previously presented to the Board," the Board was "to set a parole date" for Rosenkrantz. The order states that the parole date is to be commensurate with Rosenkrantz's conviction of second degree murder, not commensurate with first degree murder or with murder by special circumstances, and also states that, "[i]f a new parole hearing ... is not held within 90 days of this order, then the defendant shall be ordered released on parole forthwith. [¶] The Court also orders that, at the hearing in which a parole date is set, Commissioners Van Court and Giaquinto not sit in judgment as the record reflects that they are biased against the defendant." The Board of Prison Terms asked for a stay. The superior court denied the request. The Board then filed a notice of appeal and, shortly thereafter, filed a petition for a writ of supersedeas to stay the April 30 order. We issued a temporary stay and requested opposition, then denied the Board's petition and dissolved the stay.
The September 9, 1999, Parole Suitability Proceedings. The Board complied with the 90-day provision of the superior court's order by setting a parole suitability hearing for September 9, 1999. The hearing was held as scheduled (before Commissioners Dave Hepburn and Leonard Munoz, and Deputy Commissioner Fernando Vazquez). As before, all of the comments about Rosenkrantz's conduct were "laudatory." He was described by everyone as an exemplary prisoner. He had obtained his bachelor of science degree. There were current letters from the trial judge, from Captain Don Mauro of the Sheriffs Department Homicide Division stating the department's nonopposition to parole, a current letter from the investigating deputy (who continued to affirmatively support parole), at least two job offers, and other letters of support (including a letter from the victim's grandmother, his only living relative, in support of Rosenkrantz's release). For the reasons set out in the margin, the panel unanimously found Rosenkrantz unsuitable but nevertheless granted a parole date.[14] In November, the *289 Governor "invoked his authority to reverse the Board's decision to grant Parole." (Cal. Const., art. V, § 8; Pen.Code, § 3041.2.) The Governor's statement of reasons notes that the Board's finding of suitability was "based solely on an order from the Los Angeles Superior Court, which order is now on appeal."
The Further Proceedings in the Superior Court. In December 1999, Rosenkrantz filed a motion to "enforce" the superior court's April 30 order in which he claimed that the Board's failure to find him suitable for parole triggered the clause directing his immediate release. In January 2000, the superior court denied Rosenkrantz's request for immediate release but ordered the Board of Prison Terms (1) to hold a new suitability hearing within 60 days and (2) to find Rosenkrantz suitable for parole and set a parole date commensurate with Rosenkrantz's second degree murder conviction.[15]
The Board's Petition for a Writ of Mandate. On January 28, 2000, the Board of Prison Terms filed a petition for a writ of mandate in which it asked us to set aside the superior court's January 20 order. We issued an order to show cause, set the matter for hearing, and later consolidated the writ proceedings with the Board's appeal from the April 30, 1999, order. Meanwhile, the Board complied with the January 20 order and set another suitability hearing for March 17. Based on the pending appeal and other concerns, Rosenkrantz asked the superior court to vacate its January 20 order. The superior court granted that request, and the March 17 hearing date was thereafter vacated. Although the issue raised by the mandate petition (the superior court's power to enforce its orders) may be temporarily moot, it is probable that it will arise again. For that reason, we consider the substance of the superior court's January 20 order (as well as all of the proceedings leading to that order), and address (but do not resolve) *290 the enforcement issue. (Eye Dog Foundation v. State Board of Guide Dogs for the Blind (1967) 67 Cal.2d 536, 541, 63 Cal.Rptr. 21, 432 P.2d 717; In re William M. (1970) 3 Cal.3d 16, 23, 89 Cal.Rptr. 33, 473 P.2d 737.)[16]

DISCUSSION

I.
The Board of Prison Terms is authorized by statute to determine parole suitability, and to exercise its discretion in deciding whether to grant or deny parole. (Pen.Code, §§ 3040, 5075 et seq.; In re Fain (1983) 145 Cal.App.3d 540, 548, 193 Cal.Rptr. 483.) That discretion, although broad, is not absolute, and the Board's decisions must be supported by "some evidence." (In re Powell (1988) 45 Cal.3d 894, 902-904, 248 Cal.Rptr. 431, 755 P.2d 881; see also Terhune v. Superior Court (1998) 65 Cal.App.4th 864, 872-873, 76 Cal.Rptr.2d 841; In re Minnis (1972) 7 Cal.3d 639, 646-647, 102 Cal.Rptr. 749, 498 P.2d 997 [although a prisoner serving an indeterminate sentence is "not entitled to have his term fixed at less than the maximum or to receive parole, he is entitled to have his application for these benefits `duly considered'"].) On this appeal, the Board of Prison Terms pays lip service to these rules but contends, without reference to the facts of this case, that it acted within its discretion in finding Rosenkrantz unsuitable for parole and that, because the Board says so, the superior court abused its discretion in concluding otherwise. We disagree.

A.
The Board of Prison Terms is required to determine parole suitability according to the guidelines set out in section 2402. We address those guidelines seriatim.
Subdivision (a) of section 2402 provides that, "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." At the September 9, 1999, suitability hearing, there was no evidence to suggest that Rosenkrantz poses an unreasonable risk to society. All of the evidence is to the contrary. (See fns. 2, 6, 7, ante.)
*291 Subdivision (b) of section 2402 directs the panel to consider "[a]U relevant, reliable information available" to it, including "the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."
Subdivision (c) of section 2402 sets forth the "circumstances tending to show unsuitability" for release. With regard to the commitment offense, the Board may consider whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." In determining whether the commitment offense was "especially heinous, atrocious or cruel," the Board may consider whether there were multiple victims, whether "[t]he offense was carried out in a dispassionate and calculated manner, such as an executionstyle murder," whether "[t]he victim was abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether the "motive for the crime is inexplicable or very trivial in relation to the offense." At the September 9, 1999, hearing, the Board's only unsuitability findings were (1) that the commitment "offense was carried out in [an] especially cruel or callous manner," (2) that "it was carried out in a dispassionate or calculated manner, such as an execution style murder," and (3) that "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering."
The first and third findings are insufficient because (a) there is no evidence that Rosenkrantz displayed "an exceptionally callous disregard for human suffering" and (b) this finding by itself could not possibly be sufficient since (as the superior court noted) it would necessarily apply to every second degree murder. (People v. Summers (1983) 147 Cal.App.3d 180, 184-185, 195 Cal.Rptr. 21; People v. Matta (1976) 57 Cal.App.3d 472, 480-481, 129 Cal. Rptr. 205; People v. Beyea (1974) 38 Cal. App.3d 176, 188-189, 113 Cal.Rptr. 254; see also CALJIC No. 8.31.) The second finding is insufficient because there is no evidence that this was an "execution style murder" or anything like that. To the contrary, Rosenkrantz was expressly acquitted of first degree murder. (§ 2326 ["[c]riminal charges not resulting in conviction (charges which resulted in acquittal or dismissal for any reason) shall not affect the parole date unless the factual circumstances surrounding the charge are reliably documented and are an integral part of the crime for which the prisoner is currently committed to prison"]; see In re Lewallen, supra, 23 Cal.3d at p. 281, fn. 3, 152 Cal.Rptr. 528, 590 P.2d 383 [a sentencing judge may not consider a charge of which the defendant was acquitted].) The Board has never attempted to explain its repeated refusal to follow the law. To the contrary, by "modifying" the August 1998 transcript to delete the panel's "inadvertent" description of Rosenkrantz's offense as "a first degree murder case," the Board has essentially conceded this point. (Fn.12, ante.)[17]
*292 Subdivision (d) of section 2402 lists the circumstances tending to show suitability, with "the importance attached to any circumstance or combination of circumstances in a particular case ... left to the judgment of the panel." The circumstances include the absence of a juvenile record, the stability of the prisoner's relationships with others, signs of remorse, the motivation for the crime (the "prisoner committed his crime as the result of significant stress in his life, especially if the stress ha[d] built over a long period of time"), the absence of a criminal history, the prisoner's present age (as reducing the probability of recidivism), the prisoner's post-release plans for the future, and his institutional behavior when his "activities indicate an enhanced ability to function within the law upon release." As the superior court pointed out, every panel (with the exception of the June 1996 panel) that has heard Rosenkrantz's applications for a determination of parole suitability has failed or refused to consider the uncontroverted fact that Rosenkrantz committed "his crime as the result of significant stress in his life [that] ha[d] built over a long period of time."[18]

B.
The only "facts" discussed in the Board's briefs (on appeal and in support of its writ petition) are the findings made by the commissioners about the nature of Rosenkrantz's crime. The Board does not cite to a single piece of evidence to support those findings. By way of example, the Board's brief notes the commissioners' statement, in rendering their decision, that Rosenkrantz "`needs additional therapy in order to face, and discuss, understand and cope with stress in a nondestructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others.'" There is no reference to any evidence that might support such a finding, and we have found none. Indeed, all of the evidence before the commissioners shows just the oppositethat Rosenkrantz has faced, discussed, understood and learned to cope with stress in a nondestructive manner, and that he is neither unpredictable nor a threat to others, (See fn. 7, ante.) And while we agree with the Board's abstract assertion that it was within its province to resolve conflicting evidence (In re Powell, supra, 45 Cal.3d at p. 902, 248 Cal.Rptr. 431, 755 P.2d 881), the point is patently irrelevant in light of the Board's admission, in its opening brief, that "[t]here is no conflicting evidence here on the central issues of the findings at Rosenkrantz parole suitability hearings."

C.
On April 30, 1999, the superior court ordered the Board of Prison Terms to hold a new parole suitability hearing and, absent *293 "changed circumstances or new information ... that was not previously presented to the Board," to set a parole date for Rosenkrantz commensurate with his conviction of second degree murder, not first degree murder. In response to the April 30 order, the Board conducted the September 9, 1999, suitability hearing. Although there was not a single changed circumstance or any new information, the panel found Rosenkrantz "unsuitable," then granted a parole date in order to "comply" with the April 30 order. For the reasons stated in the preceding sections of this opinion, we agree with Rosenkrantz that the September 9, 1999, finding of unsuitability is unsupported by any evidence and that the panel's decision cannot stand.

II.
Had the superior court not vacated its January 2000 order, our conclusion that the unsuitability finding is unsupported by any evidence would have triggered the superior court's unconditional order to the Board to find Rosenkrantz "suitable" for parole. It is that order that is challenged by the Board's petition for a writ of mandate, on the ground that the superior court is without jurisdiction to "dictate the result that must be reached." (Pen.Code, §§ 3040, 3056, 3077; In re Schoengarth (1967) 66 Cal.2d 295, 300, 304, 57 Cal.Rptr. 600, 425 P.2d 200.) When the superior court vacated its January 2000 order, the Board asked that we nevertheless decide this issue on the ground that it is likely to arise again. We decline.
We conclude that the enforcement issue is not ripe for decision at this time. We reach this conclusion because we do not believe the Board has, as yet, satisfied the spirit of the superior court's April 30, 1999, order for a new suitability hearing conducted according to the laws of this state and the regulations governing the Board's parole decisions. It is one thing to go through the motions so that a panel can recite a post hoc rationalization for a decision already made. It is quite another to hold a fair hearing at which three unbiased commissioners actually read the reports and other documents in Rosenkrantz's file and then make a reasoned decision based on the appropriate factors.
At the conclusion of this opinion, we direct the Board to schedule and commence a new suitability hearing within 30 days, and to render a new determination in strict accordance with both the letter and the spirit of the views expressed in this opinion. We do this in deference to the Board's authority, in recognition of its statutory mandate to calculate the parole date for prisoners serving indeterminate sentences, and in anticipation of the Board's good faith compliance with our orders. We anticipate that the Board will find Rosenkrantz suitable for release on parole and that a parole date will be set. We emphasize, however, that the superior court will retain jurisdiction over this matter, and that it will have the power to enforce this order as well as its own orders, by contempt or by such other means as it deems appropriate under the circumstances. (Code Civ. Proc., §§ 128, subd. (a)(4) [every court has the power to compel obedience to its orders], 1209, subds. (a)(3), (a)(5); In re San Francisco Chronicle (1934) 1 Cal.2d 630, 634, 36 P.2d 369 [courts have inherent power to punish for contempts, whether of a direct or constructive nature, and the other branches cannot constitutionally infringe on that power]; Ross v. Superior Court (1977) 19 Cal.3d 899, 141 Cal.Rptr. 133, 569 P.2d 727; City of Vernon v. Superior Court (1952) 38 Cal.2d 509, 241 P.2d 243; Security T. & S. Bk. v. S.P.R.R. Co. (1935) 6 Cal.App.2d 585, 588, 45 P.2d 268 ["a court possesses inherent power to enforce its judgments"]; Klinker v. Klinker (1955) 132 Cal.App.2d 687, 694, 283 P.2d 83.)
At some point, a failure to follow the law, or the continued application of an arbitrary and irrational standard, will rise to the level of a substantive due process violation. (Cf. Stubblefield Construction *294 Co. v. City of San Bernardino (1995) 32 Cal.App.4th 687, 708-710, 38 Cal.Rptr.2d 413; Pearson v. City of Grand Blanc (6th Cir.1992) 961 F.2d 1211, 1216-1217.) It is at that point (if at all) that the enforcement issue will be decided. In the meantime, however, we flatly reject the Board's contention that (a) Rosenkrantz's only remedy is the continuing charade of meaningless hearings, and (b) that the superior court lacks the power to compel the Board to follow the law. (Code Civ. Proc., §§ 128, subd. (a)(4), 1209, subds. (a)(3), (a)(5); In re San Francisco Chronicle, supra, 1 Cal.2d at p. 634, 36 P.2d 369; floss v. Superior Court, supra, 19 Cal.3d 899, 141 Cal.Rptr. 133, 569 P.2d 727; City of Vernon v. Superior Court, supra, 38 Cal.2d 509, 241 P.2d 243; Security T. & S. Bk. v. S.P.R.R. Co., supra, 6 Cal.App.2d at p. 588, 45 P.2d 268; Klinker v. Klinker, supra, 132 Cal.App.2d at p. 694, 283 P.2d 83; see also In re Johnson (1995) 35 Cal. App.4th 160, 173, 41 Cal.Rptr.2d 449 [on habeas corpus, directing the Board of Prison Terms to vacate a decision rescinding parole dates, and to schedule and commence a new rescission hearing within 30 days]; In re Fain (1983) 139 Cal.App.3d 295, 311, 188 Cal.Rptr. 653 [on habeas corpus, remanding to the Board of Prison Terms for "further review and determination in light of our opinion," with the trial court retaining jurisdiction].)

DISPOSITION
The April 30, 1999, order is affirmed. The petition for a writ of mandate is granted in part and dismissed in part, as follows: The Board of Prison Terms is ordered to schedule and commence a new suitability hearing within 30 days of the date this opinion is filed, and to render a new determination in strict accordance with both the letter and the spirit of the views expressed in this opinion. Jurisdiction to enforce this order, and to make and enforce such other orders as are necessary in aid thereof, is vested in the superior court.
SPENCER, P.J., and MASTERSON, J., concur.
NOTES
[*] Brown, J., dissented.
[1] The procedures governing parole are set out in title 15 of the California Code of Regulations, section 2000 et seq. (Further undesignated section references are to Title 15 of the Code of Regulations.) Section 2000, subdivision (b)(3)(B) defines a prisoner serving a sentence of life with the possibility of parole for second degree murder committed on or after November 8, 1978 (such as Rosenkrantz), as a "life prisoner." Section 2000, subdivision (b)(65) defines the minimum eligible parole date for life prisoners as the earliest date on which the prisoner may legally be released on parole. Section 2000, subdivision (b)(76) defines a "parole consideration hearing" as any "hearing at which a prisoner's parole suitability is considered including an initial parole hearing, subsequent hearing, and rehearing." Section 2269.1 provides that life prisoners shall have hearings prior to their minimum eligible parole dates and that, "[o]nce the parole date is established, these prisoners shall have progress hearings as provided in Section 2269." (See also § 2400.) Section 2269 provides for "progress hearings" if a parole date is more than 10 months from the date of the last parole consideration hearing. Section 2270 provides that a prisoner who has previously been denied parole shall be reconsidered for parole at the intervals and in the manner therein specified. Section 2401 provides that a "life prisoner shall be considered for parole for the first time at the initial parole consideration hearing.... A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public...." Section 2402, discussed below, addresses the determination of parole suitability and lists the information to be considered, the circumstances tending to show unsuitability, and the circumstances tending to show suitability.
[2] "The Panel ... relied upon the following circumstances in concluding that the prisoner is suitable for parole and would not pose an unreasonable risk or danger to society [or] a threat to public safety if released from prison at this time. [He] has no juvenile record, whatsoever. He had a stable social history as exhibited by a reasonable, stable relationship with others, good adjustment, excelled in school, graduating from high school, acceptance to college, no drugs or alcohol involvement or gang involvement. While in prison, the prisoner has enhanced his ability to function within the law upon release through participation in several programs, particularly upgrading the educational area, receiving his AA and [is] one semester short of a BA. He also participated in self-help and therapy programming, which was extensive, to come to an understanding of why he reacted so violently as he did in the instant offense.... His work reports are excellent .... It's noted the prisoner committed the crime as a result of significant stress in his life and because of his homosexual tendencies which he had attempted to conceal from his family, friends and community. When confronted, reacted violently, so it was a contributing factor, his father's failure to accept his son's homosexuality contributed to the extreme stress that the prisoner had at that particular time. The prisoner lacks any criminal history, whatsoever. Also because of maturation, growth, greater understanding and/or an advanced age has reduced probability of recidivism. It's noted that the prisoner has realistic parole plans, which include a job offer and very strong family support and support from many friends. It's also noted the prisoner has maintained positive institutional behavior which indicates significant improvement in self-control, absolutely no disciplinaries since he's been incarcerated. The prisoner shows signs of remorse. He has indicated that he understands the nature and magnitude of the offense he committed, accepts responsibility for his criminal behavior and has a desire to change towards good citizenship.... [T]he trial judge[ ] is supportive, states that the murder was situational, highly unlikely to re-offend. The trial attorney ... was supportive. The Governor's legal advisor, Daniel Kolkey, and the [Deputy] District Attorney ... from the County of Los Angeles, was supportive of release. The psychological/psychiatric report ... is supportive." (Italics added.) Rosenkrantz was told that he would be advised of the precise date.
[3] The Decision Review Unit identified the issues in need of further review based upon the Unit's consideration of "additional information which was not available to the grant panel," as follows: "At the grant hearing, the prisoner referred to the incident [at the beach house] as an `attack' on him.... It should be noted that the prisoner bought the weapon used to carry out the murder the day after this incident. The prisoner's version of this incident ..., in part, differs from the prisoner's brother's version. The prisoner's brother, Joseph Rosenkrantz, told investigators [in 1985] that after their initial entry into the house, Joseph told the prisoner that he wouldn't tell anyone what he had seen and that all they wanted to do was leave.... The prisoner's version indicates that he did not know the `intruders'.... [¶] Also regarding the prisoner's `past and present mental state' and `behavior before, during after the crime,' the investigation reports indicate the following events occurred before and after the crime: the prisoner threatened the victim the night before the murder, a witness stated that the prisoner told him he had bought the firearm and was going to kill his brother and the victim, the prisoner called a nurse approximately 15 days after the murder and said he `did society a favor,' and, approximately 13 days after the murder, the prisoner called the victim's mother and stated he wasn't through yet. In addition, it should be noted that prior to the offense the prisoner went to the firing range." The Decision Review Unit obtained these facts from the 1985 investigation reports of the Los Angeles Sheriffs Department. As reflected in footnote 4, post, several of the cited "facts" are incorrect.
[4] In 1996, Sergeant McComas wrote: "It is my sincere opinion that Robert Rosenkrantz has been sufficiently punished and has paid for his crime by his ten-year incarceration.... [¶] In my 35 years experience as a Sheriff's Deputy and my 15 years as a homicide investigator, few cases have caused me as much reflection as this one did. The total of events are truly a tragedy that sadly affected the lives of many good people. If only Robert's father and mother did not care for him so deeply. If only they did not have such high expectations for him he could have easily admitted his homosexual tendencies without fear or shame. If only Robert's brother Joseph did not see the opportunity to exploit Robert's secret to his own sibling advantage. If only Steve Redman had not been such a willing participant in the surprise confrontation of Robert at the family beach house. If only Robert had been mature enough to deal with all these problems the outcome obviously would have been different. [¶] At the time of Robert's arrest he was with his attorney, Mr. Richard Plotin. Mr. Plotin advised me that Robert was invoking his constitutional rights ... and insisted that I not question Robert. I did not question Robert but he seemed relieved that he had finally been caught. He voluntarily talked about some facts of the case and explained some of the discrepancies contained in my investigative report. None of the information Robert provided would have changed the fact of his guilt and I ... did not alter my previous report. [¶] As a result of talking with Robert, I did feel that some of the statements made in the investigative report, attributed to Robert's brother, Joseph, may have been somewhat self serving. The incident at the beach house was the trigger that set the events in motion that ended with Steve Redman's death.... [¶] When I was at the scene and investigating the homicide, I found the victim ... was armed with a `stun gun' and a knife. Redman's `stepfather' engaged in para-militaristic activities and encouraged Steve Redman in these pursuits. The victim's `stepfather' continually made inflammatory statements in the community that may have influenced some of the victim's friends to take inappropriate actions. The Rosenkrantz family received harassing telephone calls during this period of time. I would also doubt that Robert Rosenkrantz actually made threatening phone calls to anyone during the time before his arrest. The victim's mother's drug addiction and alcohol dependency made her statements less than reliable, in my opinion...." (Italics added.)
[5] "The panel has unanimously determined that you're not suitable at this time and that you would pose an unreasonable risk and we based it on the following factors. The commitment offense was dispassionate and calculated. These conclusions are drawn from the statement of facts wherein the prisoner, after having a confrontation with his brother and the victim, the prisoner mused over the confrontation for several days, went to a shooting range; he rented a weapon and practiced shooting; he also purchased a weapon and confronted the victim later and shot him multiple times, causing his death.... At least one of the rounds was fired into the victim's head after he was down.... [T]he prisoner has no prior criminal history. There's no evidence of an unstable social history. There is evidence that the prisoner was having difficulty dealing with his sexuality. Under institutional behavior, he has programmed well. Under remarks, the panel finds that the prisoner's gains are recent and he must demonstrate an ability to maintain gains over an extended period of time. However, the prisoner has programmed well. He's upgraded educationally. He's one semester short of his BS degree. His work reports were fine. He's done a good job while in the institution. However, these positive aspects do not outweigh the factors of unsuitability. This is a one-year denial and in the interim we're asking that you remain disciplinary-free.... We're also recommending that you be placed into a Category-X program at the appropriate institution. We want them to evaluate your violence potential in the free community; also, to evaluate the prisoner's mental status...." (Italics added.) When Rosenkrantz's lawyer pointed out to the commissioners that the "Category-X program" had been disbanded, he was told that the program was "still being discussed" and that, in any event, the panel was "sure that they will make arrangements for ... some other program here at the institution."
[6] The correctional counselor's five-page report concludes that, "[c]onsidering the circumstances of the commitment offense, absence of prior record, and excellent prison adjustment, I believe that Rosenkrantz would pose no threat to the general public if released from prison at this time. He had absolutely no criminal background prior to the commitment offense and his institutional adjustment has been exemplary. His conduct in prison is indicative of an inmate who is ready for release." (Italics added.)
[7] This Evaluation (signed by three psychologists) describes Rosenkrantz as "neatly groomed and dressed." It notes that he "acknowledges his complete responsibility" for the crime. "When asked to explain why this crime happened, he gives accurate insight into his then inability to deal with the intense stress of being exposed as homosexual to his parents and then being rejected by them." When asked about the post-shooting phone calls to the victim's family, "he denies that this occurred. He stated that he believed that prank phone calls were being made by other persons." The evaluation states that, at "the present time his attitude does not suggest continued hostility or debasement of the victim.... He does not blame his family although it could be argued that some blame should attach to them. He acknowledges the fairness of his sentence and expresses his understanding of responsibility for the crime." Under the heading "Conclusions," the Evaluation includes these comments: "The inmate continues to exhibit a favorable pattern of programming and institutional adjustment. It is clear from considering the events of the commitment offense that it was propelled by a situation that is unlikely to recur.... [T]he commitment offense was committed in the context of specific situational factors that precipitated a mental disorder that impaired his judgement and impulse control. However, since that time the specific situational influences (i.e., his relationship with his parents) have changed and the inmate's desperation to conceal his sexual identity has also resolved.... [I]t is clear that the ... offense does not reflect an habitual pattern or propensity for irrational violence.... Therefore, given these considerations, the inmate's violence potential outside of a controlled setting is considered to be well below average in comparison with the average inmate." (Italics added.)
[8] Assemblywoman Carole Migden, Assemblywoman Martha Escutia, and Senator John Vasconcellos wrote to urge the Board of Prison Terms to consider that, although Redman's violence "obviously does not absolve [Rosenkrantz] of responsibility" for Redman's death, it was a factor to be considered. The letter opines that "[t]he action of the Board in overturning the June 1996 decision to release Mr. Rosenkrantz raises the disturbing possibility that the reprehensible gay-bashing endured by Mr. Rosenkrantz is not being viewed in the same light as other hate crimes, despite the fact that the law of California recognizes it as an equally grave offense."
[9] During the hearing, Commissioner Giaquinto nevertheless made the following comments to Rosenkrantz: "All right. We sent out letters to agencies that might have some interest in your case and we got the sheriff's letter and the People are represented by the Deputy District Attorney. Even though we didn't read these other letters in as we did the sheriff's letter, I did, and I know the other panel members did, read the letters. And to tell you the truth, after I've read some of these letters, I began becoming more and more concerned. And I'm going to just shoot straight from the hip.... None of this gobbledy-gook legal hearing stuff and I'm going to tell you what I feel. Over the years, th[e] victim has been depicted as the main instigator, a burglar, a felon, all kinds of things. And especially by these people that are writing in your support, like the Assembly people. I was shocked when I read this letter from Assemblywoman Midgen and the way this victim was depicted.... Why do all these officials, why do all these briefs make these arguments that are not true. They're jaundiced. They're slightly off center. They're embellished. They redirect the responsibility. (Italics added.) Commissioner Giaquinto accused Rosenkrantz of "allowing" the denigration of Redman, then accused the investigating officer of either gross incompetence or lying for Rosenkrantz's benefit. Commissioner Giaquinto also said the "positive psych reports" were based on "many statements" that "are not true. And those have to do with the culpability of the victim and some of the things that preceded the murder. It's ... going to skew the analysis." He told Rosenkrantz he had to "start clearing up these issues, because you read through all what these clinicians think and they think the same as that other gobbledy-gook about some of the things the victim did not do...." (Italics added.)
[10] "The panel reviewed all the information received from the public and relied on the following circumstances in concluding that the Prisoner is not suitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety if released from prison. The offense was carried out in a cruel and callous manner with a disregard for the life and suffering of another, in a dispassionate and calculated manner.... The Prisoner has not sufficiently participated in beneficial self-help and therapy programming.... [C]ontinued therapy is needed so that the Prisoner might delve into the causative factors related to the stress that was occurring in his life at the time of the murder and the exploration of the ... crime itself, his sexuality and how that may have played a role in his having committed this crime. Until progress is made, the Prisoner continues to be unpredictable and a threat to others. [Cf. fns. 2, 7, ante.] [¶] The Prisoner should be commended for being disciplinary free. His classification score is zero. He's upgraded educationally and vocationally. He's got a proficiency certificate in computer science program, an AA degree from Chapman, Literacy Program involvement as a tutor. He has previously been involve[d] in therapy and he's got a certificate in data processing and word processing and should be commended for these things. However, these positive aspects of his behavior do not outweigh the factors of unsuitability. This is a one-year denial ... and we would ask that you remain disciplinary free and participate in self-help and therapy programming and upgrade educationally and vocationally.... You know what? You present very well. Maybe it's time you started standing on your own merits. You did a terrible thing. You're serving the time. (Inaudible) doesn't just present who you are today without all this other gobbledy-gook and finger-pointing and all that other jazz." Commissioner Van Court summed it up for Rosenkrantz: "I just think you're doing a super job and just hang in there. You know, don't consider this a setback. Because, you know, if you read this case very critically, that's first-degree murder if I ever saw one, the actual crime itself...." (Emphasis added.)
[11] In a progress report, Rosenkrantz's conduct was described as "exceptional." He had remained discipline-free. His correctional counselor again opined that Rosenkrantz "would pose no threat to the public safety if released from prison at this time." There was no negative information about Rosenkrantz. But the record does include copies of letters sent by Assemblywomen Migden and Escutia and Senator Vasconcellos to the Chair of the Board of Prison Terms, his response, and a letter from Commissioner Giaquinto to the legislators, all directed at Commissioner Giaquinto's remarks at the August 1997 hearing. (Fn.9, ante.)
[12] On October 27, 1998, the Decision Review Unit recommended a "modification" of the decision. According to this report, "[a]lthough the hearing panel clearly recognized that the inmate was convicted of second degree murder, in the decision portion of the hearing transcript, the panel inadvertently stated, `... laid in wait.'" The recommendation was to "excise" that language from the decision and replace it with a statement that he "`... waited in his vehicle all night outside the victim's condominium complex, until the victim emerged.'" The next day, the Decision Review Committee (with Commissioner Ortega serving as one of a committee of three) adopted the recommendation and modified the decision. (See § 2326 [criminal "charges not resulting in conviction (charges which resulted in acquittal or dismissal for any reason) shall not affect the parole date unless the factual circumstances surrounding the charge are reliably documented and are an integral part of the crime for which the prisoner is currently committed to prison"]; cf. In re Lewallen (1979) 23 Cal.3d 274, 281, fn. 3, 152 Cal.Rptr. 528, 590 P.2d 383 [a sentencing judge may not consider a charge of which the defendant was acquitted].)
[13] The superior court found that the decisions to deny parole were "contrary to the evidence presented at the hearings" and that "[a]ll of the evidence ... indicated that the defendant is not a danger to society." This is the way the superior court explained this case:

"It is difficult to imagine that any inmate could present a better picture than the defendant has in terms of his background, his institutional adjustment, and his parole plans. However this court recognizes that no matter how stellar an inmate's adjustment and progress in the institution may he, it can be outweighed by the circumstances of the offense. In evaluating the circumstances of the offense, the Board must accept the verdict of the jury. In this case, the defendant was EXPRESSLY ACQUITTED OF FIRST DEGREE MURDER. The jury found the defendant not guilty of premeditation and deliberation. This was after a trial in which the defendant himself testified about the circumstances of the offense. In reading the comments of the commissioners at the last three hearings and the statements of decision, it is apparent that some commissioners decided on their own that the evidence supports a finding of premeditation and lying in wait and have based their decisions denying parole on these findings, contrary to the express findings of the jury. The primary reason for denying parole in all three hearings is that the offense was `dispassionate' and `calculated' and/or was `carried out in a manner which exhibits a callous disregard for the life and suffering of another.'
"`Dispassionate' means `free from emotion or prejudice; calm and impartial.' ... No rational person could describe this killing as calm and without emotion.... [¶] `Calculated' means `planned.' ... The verdict expressly rejected that the killing was planned. In finding the defendant not guilty of premeditation and deliberation, the jury must have accepted the defendant's claim that he did not go to the house planning to murder the victim. In finding him guilty of second degree murder, they found that he did not form the intent to kill until just shortly before the killing. The finding that the killing was `dispassionate' and `calculated' is contrary to the evidence and contrary to the verdict of the jury.
"At the last hearing of the Board of Prison Terms, the commissioners must have finally realized that this factor, that is, that the killing was `dispassionate and calculated' was not applicable to this case. Instead they found that the `offense was carried out in a manner which exhibits a callous disregard for the life and suffering of another.' (Of course, all second degree murders by their nature involve a disregard for the life of another.) The regulations word this factor slightly differently: `The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.' [§ 2402, subd. (c)(1)(D).] This appears to refer to something akin to torture or that the victim suffered much more than that which would be inherent in any killing. There is no evidence of that in this case. In support of this `callous disregard' finding, the Board stated, `These conclusions are drawn from the Statement of Facts where the prisoner laid in wait for the victim to come out.' ... `Lying in wait' is a special circumstance which, if found to be true by a jury, requires a sentence of life without the possibility of parole.... Apparently recognizing that this may seem inconsistent with a verdict of second degree murder, legal counsel [for the Board] recommended that `laid in wait for the victim to come out' be deleted and replaced with `waited in his vehicle all night outside the victim's condominium complex, until the victim emerged.' There is nothing in this case to support a finding of an exceptionally callous disregard for the suffering of another.
"On the other hand, the decisions make little or no mention of any circumstance of the offense weighing in the defendant's favor. One of the factors tending to show suitability for parole is `Motivation for Crime:' [¶] `The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.' [§ 2402(d)(4).] ... This factor, which is clearly supported by the evidence, was completely ignored....
"The Court also finds that Commissioners Van Court and Giaquinto are biased against the defendant and should not participate in his parole hearing." (Italics added.)
At this point, the superior court discusses Commissioner Van Court's statement, "that's first-degree murder if I ever saw one, the actual crime itself," and notes that (at the same hearing) Commissioner Giaquinto stated that this offense was "as terrible as some of these drive by gang shootings we see." Commissioner Giaquinto's comments about the letter from the legislators, quoted in footnote 9, ante, were quoted by the superior court. The superior court then continued thus:
"Although the letters may have gotten a few facts wrong ..., Commissioner Giaquinto appears to be mistaken about other things which he felt were misrepresentations.... [¶] It seems strange that Commissioner Giaquinto should be so enraged that the victim is depicted as having committed felonies. Residential burglary, assault with a deadly weapon, assault resulting in great bodily injury are all not only felonies, but `strikes' as well under current law.... [¶] Commissioner Giaquinto also seemed offended that the defendant's father is an attorney who has money and who has tried very hard to help his son get released. Just as it is inappropriate to be biased against the poor, it is also inappropriate to be biased against the wealthy.... [After quoting a statement that Commissioner Giaquinto made to Rosenkrantz in which the commissioner referred to Rosenkrantz as "pal," the court described the] use of the term `pal' [a]s unprofessional and demeaning. The commissioner and the inmate are not pals, and they both know it. To understand how demeaning it is, one need only to imagine how it would sound if the inmate referred to the commissioner as `pal.'
"[Generally, all of the hearings for the Board of Prison Terms held in one week are staffed by the same three commissioners. Rosenkrantz's lawyer] alleges that the three commissioners normally assigned that week did not conduct this hearing; rather Commissioner Giaquinto was substituted in for one of the commissioners for only this hearing and perhaps one or two other hearings. The claim is that Commissioner Giaquinto must have specifically requested to substitute in on this hearing so that he could insure that the defendant was denied parole. Since this court has already found that Commissioner Giaquinto was biased against the defendant, there is no need to conduct an evidentiary hearing into whether or not this is true. If it were true, I am sure that the chair of the Board would put a stop to such a practice." (Italics added.)
[14] "Mr. Rosenkrantz, we found you unsuitable for parole but we are granting you a parole date today.... The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The number one reason, really the only reason, is the commitment offense itself. You've done tremendously while you've been in the institution, you've made tremendous progress. But it's the nature of the crime itself is the reason we found you unsuitable for parole. The Panel found that the offense was carried out in especially cruel or callous manner and that it was carried out in a dispassionate or calculated manner, such as an execution style murder, and that the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.... [T]he prisoner's gains are recent and he must demonstrate an ability to maintain gains over an extended period of time. Nevertheless, the prisoner should be commended for remaining disciplinary-free, for upgrading educationally, including receiving a Bachelors Degree, for doing computer programming work that has benefited [the Department of Corrections], and for participating in self-help groups. However, these positive aspects of his behavior do not outweigh the factors of unsuitability. However, pursuant to a Court Order ... dated April 30, 1999 ..., this Panel is required to set a parole date. Therefore, pursuant to this Order, we are granting you a parole date today. The calculation of the parole date is as follows...." (Italics added.) Although the method of calculating Rosenkrantz's release date was discussed, no release date was stated. The proceedings terminated following the Presiding Commissioner's comment that Rosenkrantz was "not to be released prior to the Governor exercising his review authority."
[15] In its January 20, 2000, order, the superior court found "the Board of Prison Terms did not comply with the court's [April 30, 1999, order]. Accordingly, the court orders the Board of Prison Terms to hold a new parole consideration hearing within sixty days for Mr. Rosenkrantz. Unless there are changed circumstances or new information is presented that was not previously presented to the Board al this hearing, you are ordered to find Mr. Rosenkrantz suitable for parole. [¶] You are further ordered not to find that the offense was carried out in an especially cruel or callous manner, that the offense was carried out in a dispassionate manner, such as an execution style murder, or that the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] The Board is then ordered to set a parole date or base term ... commensurate with Mr. Rosenkrantz's conviction for SECOND DEGREE MURDER, not commensurate with first degree murder or murder by special circumstances."
[16] The practical effect of a parole suitability finding is that a base term is set. (§ 2403, subd. (a).) The regulations include a "matrix" of base terms for second degree murders committed after November 8, 1978 (§ 2403, subds. (a), (c)), but the application of that matrix to Rosenkrantz appears to depend on the findings made at the time of the suitability hearing. For example, it appears that, at the time of the June 1996 suitability finding (the one reversed by the Decision Review Unit), the panel fixed Rosenkrantz's base term at 172 months, added 24 months for the firearm enhancement, and deducted 35 months for conduct credits, for a total confinement time of 13.4 years. At the time of the September 1999 hearing (where a parole date was set notwithstanding a finding of unsuitability, then vacated by the Governor), the panel increased the base term and arrived (we think) at a total confinement period of 14.6 years. According to the statistics published by the Department of Corrections for the Board of Prison Terms, it appears that (in 1998) the "median" time served in prison for second degree murder was 183.7 months (15.3 years). (For general information, see http:// www.dof.ca.gov / html / fs_data / stat-abs / sec_N.htm [the Department of Finance's web site]; see also http://www.bpt.ca.gov/ [the Board of Prison Terms web site].) Since "median" means "in the middle," we consider it safe to assume that, of the 12 second degree murder prisoners released on parole in 1998, 6 served fewer than 183 months and 6 served longer terms. (Ibid.; Webster's 3d New Internat. Diet. (1981) p. 1402.) The recently released data for 1999 shows that, for the two prisoners released on parole in 1999 who had been committed for second degree murder, the median time served in prison was only 126.3 months (roughly 10 ½ years). (http://www.cdc.state.ca.us/reports/ timesrv99.htm.) Without conduct credits, Rosenkrantz has served at least 168 months (14 years). With conduct credits, he has served at least 220 months (18.3 years). It is unclear whether the Board's published statistics include or exclude conduct credits.
[17] At the September 9, 1999, hearing, the panel did not find (and on the evidence could not have found) any other circumstance tending to show unsuitability. (§ 2402, subds. (c)(2)-(c)(6) [a previous record of violence, an unstable social history, sadistic sexual offenses, a lengthy history of severe mental problems related to the offense, serious misconduct in prison or jail].)
[18] In this regard, we note the Board's contention that "a parole denial may ultimately be based entirely on the nature of the commitment offense, as long as all other administratively prescribed `relevant factors' have been considered" by the Board. We agree (§ 2402, subd. (b) [all "relevant, reliable information available to the panel shall be considered in determining suitability for parole"]; In re Seabock (1983) 140 Cal.App.3d 29, 38-39, 189 Cal.Rptr. 310), but find the point irrelevant in light of the Board's failure to consider all of the relevant and reliable information that was available to it, particularly the uncontroverted evidence showing that the crime was committed as the result of significant, long-term stress caused by Rosenkrantz's fear of his father (and the conduct of the victim that exacerbated that fear). As shown by the transcript of the September 9, 1999, hearing, the commissioners had not even read a number of the reports that are in Rosenkrantz's file. (See Dunn v. U.S. Parole Com'n (10th Cir.1987) 818 F.2d 742, 745 [rejecting a parole decision "ostensibly based" on parole risk because the record made it clear that the use of an 18-year-old insanity acquittal to calculate a presumptive parole date was based solely on punitive considerations; there was no evidence to support a finding of parole risk based on current mental illness, only a favorable recommendation based on exemplary institutional adjustment and a conclusion by the prison staff psychologist that the prisoner was not mentally ill; for these reasons, the denial was arbitrary and capricious and an abuse of discretion].)