[No. A092699. First Dist., Div. Three. Dec. 12, 2001.]

In re EDWARD RAMIREZ on Habeas Corpus.

550

### COUNSEL

Bill Lockyer, Attorney General, Robert R. Anderson, Acting Chief Assistant Attorney General, David P. Druliner, Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Sara Turner, Susan Duncan Lee, Frances T. Grunder and Michele J. Swanson, Deputy Attorneys General, for Appellant the People.

Picone & Defilippis and Steve M. Defilippis for Respondent Edward Ramirez.

### OPINION

**PARRILLI, J.**—Edward Ramirez pleaded guilty to charges of robbery and second degree murder, and is serving a term of 15 years to life. The murder victim was an accomplice to the robberies, who died in an automobile accident during a high-speed chase by the police. Ramirez has been incarcerated since 1982. The Board of Prison Terms (the Board) denied his applications for a parole release date in 1990, 1991, 1993, 1995, 1997, and 1998. On August 18, 1999, Ramirez appeared before the Board for his seventh parole suitability hearing. The Board again denied him a parole date. Ramirez filed a petition for a writ of habeas corpus in superior court, contending the parole hearings had become a sham.

The trial court granted the writ. Based on the pleadings and exhibits on file, the court found no evidence to support the Board's findings that the murder Ramirez committed was especially atrocious, or that Ramirez needed therapy in order not to be a threat to others. The court acknowledged that Ramirez had an unstable childhood and a serious juvenile criminal record, but decided his exceptional performance while incarcerated and his excellent prospects for a stable and productive life upon release made him suitable for parole. The court ordered the Board to hold a new hearing and set a parole date for Ramirez.

The Board has appealed, and we have granted a stay. We reverse the trial court's order. We remand and direct the trial court to grant the petition with instructions to the Board to hold a new hearing and make a new determination of Ramirez's suitability for parole, consistent with the law as set forth in our opinion.

BACKGROUND

### 1. *The Crimes*

In 1982, Ramirez pleaded guilty in Ventura County to two counts of armed robbery with use of a firearm, and one count of second degree murder. He committed the offenses when he was 20 years old. The circumstances, as summarized by the Board and supplemented by Ramirez himself at the hearing, were as follows.

In the early morning hours of July 10, 1982, Ramirez left a party with Francisco Chapa, Roger Yepez, and Arnold Herrera to buy alcohol. At 1:00 a.m. Ramirez and two of his companions entered what turned out to be a biker bar, where Herrera became involved in a confrontation with some of the patrons. Ramirez displayed a shotgun, and he and his companions left the bar. As he was driving out of the parking lot, Ramirez intentionally ran over some motorcycles parked outside the bar.

Ramirez and the others were pursued by some of the bar patrons, but managed to elude them. They drove to a Stop and Go market. Chapa and Herrera entered the store. As Ramirez was getting out of the car, he saw the bar patrons drive by. He grabbed the shotgun again and pointed it at them, which persuaded them to leave. Chapa and Herrera stole beer, cigarettes, and candy, and took money from the store clerk while Ramirez was displaying the shotgun. Chapa punched the clerk. As the three men left the store, they were confronted by an elderly man who asked them what was going on. They robbed the man as Ramirez held the gun on him. After they drove away, their car was identified and pursued by the police. At one point Ramirez stopped the car, and the police ordered him to throw out the keys. However, Ramirez sped away, leading the police on a chase at high speed, sometimes exceeding 100 miles per hour. Ramirez failed to make a sharp turn and hit a large cement median. All the occupants were thrown from the car. Herrera, who was 15 years old, was killed.

The probation report prepared for Ramirez's sentencing, which was part of the record before the Board, provided a similar account. We note these additional details: Ramirez said "this is a hold up" to the young woman who was the clerk in the market. Chapa not only punched the clerk, but struck her with the plastic money tray from the register, as Herrera laughed. Ramirez threatened the 60-year-old robbery victim outside the store by racking the shotgun and saying, "[G]ive me your wallet, you son-of-a-bitch. I'm not kidding." The victim's wife, age 58, was nearby in their car. When the gun was recovered from Ramirez's car, it was not loaded.

The probation officer identified the following aggravating circumstances: Ramirez's use of the gun and threats against the older robbery victim involved the use of force beyond what was necessary to commit the offense, and indicated callousness; the victim and his wife were vulnerable due to their age; a minor (Herrera, apparently) was involved in the commission of the crimes; Ramirez's prior convictions were increasingly serious; and he was on a grant of conditional sentence when he committed these crimes. The officer noted the following mitigating circumstances: Ramirez pleaded guilty; and he had done well on parole from the California Youth Authority, although a conviction had resulted in a general instead of an honorable discharge. As a factor favoring consecutive sentencing, the probation report noted that the crimes involved separate acts of violence. In favor of concurrent sentencing were the factors that the crimes and their objectives were not predominantly independent of each other, and the crimes were committed in such a short period as to suggest a single period of aberrant behavior.

The probation officer's analysis stated that the robberies were "extremely aggravated," demonstrating Ramirez's capacity for violence. Ramirez had told the officer he did not realize the seriousness of his actions at the time because he was drunk and "loaded" on Quaaludes, and distressed about problems with his girlfriend and his job. The probation officer believed this "suggest[ed] the possibility that he could have inflicted serious injury if the shotgun had been loaded." While Ramirez's reckless driving had resulted in Herrera's death, the officer noted that Herrera was a willing participant in the crimes and would undoubtedly have been charged with robbery had he survived. The officer concluded: "The law has defined the defendant's act as murder, and although a strict application of the judicial rules could justify consecutive sentencing, it is felt that the penalty for the defendant's second-degree murder conviction will impose a much more significant and severe punishment, which also gives the Court sufficient discretion in sentencing."

At the sentencing hearing, the court indicated its agreement with the probation officer's recommendation. The prosecutor briefly argued that Ramirez might have been "technically guilty of a death penalty offense" because the elderly robbery victim had suffered two heart attacks since the crime, though he survived. The court stated: "I think in light of the circumstances, in light of his record, I think 15 to life is sufficient." The court imposed that sentence, with concurrent 7-year terms for the robberies (consisting of the aggravated 5-year term, plus 2-year enhancements for firearm use).

2. *Ramirez's Background*

Ramirez was born September 18, 1961, the sixth of his parents' seven children. His father was a barber who owned three barbershops, and the

family lived well in nice neighborhoods. When Ramirez was nine, his mother died of a blood clot caused when she fell in the home and struck her head. When he was 10, his father died of a heart attack. Ramirez was close to both his parents, and was very upset by their deaths.

After his father died Ramirez went to live with an aunt in San Jose, but soon moved in with an older brother after he got in trouble for burglaries. His older brothers introduced him to PCP and beer when he was 9 or 10, and he went on to experiment with marijuana, hashish, LSD (lysergic acid diethylamide), mescaline, amphetamines, barbiturates, and inhalants. In 1974, Ramirez suffered a juvenile adjudication for burglary. In 1976, the brother with whom he was living was killed in a drive-by shooting. Ramirez moved in with an aunt and uncle in Northridge. In 1977, he was committed to the California Youth Authority (CYA) for robbery, false imprisonment, and assault, all offenses arising from a fight between white and Mexican youths that escalated into theft of money and cars. Ramirez's CYA commitment was extended from 13 months to four years because he was involved in gang fights. He was paroled from CYA in February 1980; in October 1981 he was convicted of fighting and given probation; in April 1982 he was discharged from his CYA parole.

Ramirez worked as a truck driver after leaving CYA. Eventually he purchased his own truck. In July 1982, just before the offenses for which he went to prison, Ramirez's girlfriend asked him to leave and his truck was repossessed.

3. *Ramirez's Incarceration*

The evaluation report prepared by the Department of Corrections for Ramirez's 1999 parole hearing summarized his conduct during incarceration as follows:

"Since Ramirez entered CDC on 11/29/83, he has programmed positively. His transfers to other institutions with the exception of one, have been non-adverse, and based predomina[nt]ly on his declining classification score . . . . The Subject's one adverse transfer was in 1991, beginning with his disciplinary report, CDC 115 (CCR 3005(a) Overfamiliarity with Staff) dated 9/16/91. . . . The Subject has two other CDC 115's one Serious for Tattooing, and one Administrative for Altering a Light Fixture.[1] . . . [T]he prior Board of Prison Terms report . . . stated that it was noteworthy that

---

[1]At an earlier parole hearing, Ramirez explained the two serious disciplinary reports he had received early in his incarceration. The tattoo report resulted from an effort to cover up a gang tattoo he had gotten in the CYA. The report for overfamiliarity with staff resulted from his

the Subject received no disciplinaries for any violence, weapons, or posses-sion of substances [given] his youthful age when he was received into the Department of Corrections. This writer agrees with this prior statement. For his youthfulness at reception and the length of his term, Ramirez has done very well regarding disciplinary problems in the institution. In his work assignments, Ramirez has remained consistently above average to excellent at each institution and assignment. Currently, he is in Vocational Sheet Metal and has maintained his high standard of work reports, as he has through[out] his entire incarceration. Academically, inmate Ramirez has consistently attended school, receiving his GED and attending college. . . . He has maintained a 3.0 and above grade point average placing him on the Dean's list on several occasions. Following the recommendation of the Board of Prison Terms, Ramirez has currently enrolled in college classes for computer training which will start in the Spring. The Board of Prison Terms also recommended the Subject participate in Self-help and any other avail-able therapies which he has done not only on a consistent, but outstanding basis. He has participated in Overcomers, San Quentin Utilization of Inmate Resources Experience and Studies (SQUIRES),[2] Alternative to Violence Programs, The Protestant Chapel's Promise Keepers, and the Biblical Coun-seling Group. The Biblical Counseling Group is a three year class which requires intense theological knowledge and participation. On 2/5/98, Ramirez appeared before the Board of Prison terms . . . [and] was denied parole for a period of One year . . . . The board recommended that he: 1) Remain disciplinary free; 2) Upgrade vocationally and educationally; 3) Participate in Self-help and available therapy. In the past year, Ramirez has programmed positively, he has continued a standard of excellence in his job, his college courses and his self-help therapy. The Subject's vocational instructor . . . came to my office to verify the subject's excellent work, responsible attitude and willingness to help other students in the class. Further, Ramirez has demonstrated emotional maturity by taking financial courses to enhance his ability to function once released. He keeps in contact with his three sisters and other members of his family. He and his fiancee have made the decision not to marry while he is incarcerated."

The report noted that Ramirez had an aunt and an uncle in San Jose with whom he planned to live, and another uncle in Northridge with whom he

friendship with a staff member in the education department, who confided in Ramirez when she was going through a divorce.

[2]The 1999 file included a recent letter from a San Francisco police officer who was a coordinator with the SQUIRES program, which brought high-risk juveniles together with San Quentin inmates. The officer stated that Ramirez "has a command presence and a true sense of compassion which reaches these juveniles in ways that few others have." Ramirez had discussed continuing in the program if he were released in the Bay Area, and the officer said, "If I could get him to participate . . . it would be like Mark Maguire [sic] coming to the San Francisco Giants."

could live and who owned an auto body shop where Ramirez could work. A sheet metal union in Northern California was familiar with his work at San Quentin, and would consider him for employment if he were released. Twenty-three family members had written letters of support. The author of the report concluded: "Considering the commitment offense, prior record and prison adjustment, this writer believes the prisoner would probably pose a low degree of threat to the public at this time if released from prison."

The clinical psychologist who prepared the psychosocial report for the 1999 hearing also believed that Ramirez "represents a low risk of danger in a controlled setting or in the community." The psychologist's conclusions were stated as follows: "Mr. Ramirez appears to have matured in the sixteen years he has been incarcerated, entering as a high school dropout. He has now obtained his A.A. Cum Laude and continues to take college courses. He is interested in taking the computer program and developing skills in computer graphics as he has talent and interest in art. He had some training in body and fender and a license as a truck driver on admission. He is now in the sheet metal program with potential to apprentice to the sheet metal union. He receives laudatory chronos for his performance. Previously drug and alcohol dependent, he has been a participant in the Substance Abuse Group, Narcotics Anonymous, and is now in the Overcomers Group and the Promise Keepers Group. He has committed himself to a Christian faith and now is on the Praise and Worship Team and in the choir. He has participated in a number of therapy groups. He currently participates in the Squires Program. He has been disciplinary free for eight years. He has extensive support in the community as indicated by letters from friends, relatives, and potential job resources to the parole board and is engaged to be married to a woman with two teenagers. It would appear that he has and continues to program well and that his psychological issues are in prolonged remission. Thus any decision made by the parole board will need to be made on other than psychiatric ground[s]. This examiner would recommend his continuing participation in drug/alcohol groups and random testing be a condition of his parole."

4. *The Parole Board Hearing*

At the hearing on August 18, 1999, the Board reviewed the facts of the offense, Ramirez's record in prison, and his parole prospects. Ramirez answered questions from the Board and from his attorney. He expressed remorse over Herrera's death, saying he could never make up for it even though Herrera's family had managed to forgive him. One of Ramirez's sisters had become the common law wife of Herrera's brother, and Ramirez was the godfather of their child. A deputy district attorney from Ventura

County attended the hearing, and stated his "concern" with balancing Herrera's death against Ramirez's "present apparent change." While the prosecutor did not expressly declare his opposition to parole, he noted aggravating factors such as the "rash of crimes" committed by Ramirez, the fact that he had an opportunity to stop but did not, and the danger his reckless driving had posed to innocent drivers.[3]

At the conclusion of the hearing, the Board took a 13-minute recess and returned to announce the following decision: "The Panel has reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. And really, the reason is the commitment offense itself. Multiple victims were involved in this in same or separate incidents [sic]. And the offense was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering. Specifically in the statement of facts, Mr. Ramirez brandished a shotgun in the process of committing two armed robberies. He fled from the police at a high speed resulting in a collision, a traffic accident in which one of the occupants in his vehicle was killed. Mr. Ramirez has a previous record, an escalating pattern of criminal conduct or violence, history of unstable or tumultuous relationships with others. He's failed to profit from society's previous attempts to correct his criminality. He had a CYA commitment previously. He had an unstable social history and prior criminality which includes juvenile arrests for burglary and robbery including his term in CYA. In response to 3042 notices, [a] Deputy District Attorney from Ventura County was here to oppose Mr. Ramirez's parole. The Panel makes the following findings: The prisoner needs therapy in order to face, discuss, understand and cope with stress in a non-destructive manner. And until progress is made, the prisoner continues to be unpredictable and a threat to others. Nevertheless, the prisoner should be commended for upgrading vocationally and educationally, remaining disciplinary-free and participating in self-help and therapy programs. This denial will be for one year. And the Panel also makes the

---

[3]At Ramirez's 1991 parole hearing, a different Ventura County Deputy District Attorney appeared and declared that while Ramirez appeared to be unusually intelligent, ambitious, and truthful, she was not convinced that he recognized the seriousness of his offenses from the victims' point of view. She noted that despite his difficult family background, he showed promise. She said that while Ramirez was not yet ready for parole, "he's not somebody one wants to wash one's hands of. . . . I think ultimately he will be living on the outside. This is a man who should not spend the rest of his life in prison."

This deputy appeared again at Ramirez's 1993 hearing. While she did not believe he was then ready for immediate parole, she strongly supported giving him a parole date in the late 1990's. She noted that this was the first time she had not objected to setting a parole date for a prisoner. She stated she was struck by how little credit Ramirez was being given in the parole proceedings for his remarkable achievements while in custody.

following recommendations. Mr. Ramirez remain disciplinary-free and, if available, participate in self-help and therapy programs. And basically continue on the path you've been going down. You've been doing very well."

One of the three commissioners dissented from the decision, telling Ramirez, "I thought you were ready to go."[4]

DISCUSSION

1. *Standard of Review*

■ Because the trial court decided this case based entirely on documentary evidence, we will independently review the record to determine whether the writ was properly granted. (See *In re Cudjo* (1999) 20 Cal.4th 673, 687-688 [85 Cal.Rptr.2d 436, 977 P.2d 66].) ■ At the outset, however, we are met with the Board's contention that we lack jurisdiction to review the merits of its parole suitability determinations. The Board acknowledges that courts have limited jurisdiction to ensure compliance with minimal procedural requirements at parole hearings. But it claims the Legislature has granted the executive branch such exclusive authority over parole suitability decisions that judicial review of the Board's discretionary determination to grant or deny a parole release date would violate the separation of powers doctrine.

We are not persuaded. The Board's discretion is very broad, but it is not exclusive. (*In re Powell* (1988) 45 Cal.3d 894, 904 [248 Cal.Rptr. 431, 755 P.2d 881] (*Powell*) [Board "enjoys broad but not absolute discretion in parole-related matters"].) The Legislature has provided a clear orientation for the Board's discretionary decisions over parole dates for inmates serving indeterminate sentences, mandating that the Board "shall normally set a parole release date . . . in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ." (Pen. Code, § 3041, subd. (a).) The Board is required to "establish criteria for the setting of parole release dates." (*Ibid.*) However, it lacks discretion to promulgate regulations that are inconsistent with the governing statutes, and the judicial branch has the final word on questions of legal interpretation. (*Terhune v. Superior Court* (1998) 65 Cal.App.4th 864, 873 [76 Cal.Rptr.2d 841].)

The Governor is authorized to override the Board's parole decisions, but he is constitutionally required to make his decisions "on the basis of the

---

[4]One commissioner also dissented from the Board's 1998 denial of a parole date for Ramirez.

same factors which the parole authority is required to consider." (Cal. Const., art. V, § 8, subd. (b); Pen. Code, §§ 3041.1, 3041.2.) Thus, the executive branch does not have the kind of virtually unlimited discretion over parole matters that it has over reprieves, pardons, and commutations, which may be granted "on conditions the Governor deems proper" (subject to the Supreme Court's concurrence in cases of twice convicted felons). (Cal. Const., art. V, § 8, subd. (a); see *Jenkins v. Knight* (1956) 46 Cal.2d 220, 223 [293 P.2d 6].) The voters who approved article V, section 8, subdivision (b) of our state Constitution in 1988, and the Legislature which amended Penal Code section 3041 in 1976, clearly contemplated that the executive branch's exercise of its broad discretion over parole decisions would conform with factors prescribed by law. The statutory factors are not subject to unilateral revision by each succeeding administration. By way of contrast, we note Maryland's high court has held that Maryland's governor could properly adopt a policy denying parole to all life term inmates except the very old or terminally ill, because Maryland law did *not* require the governor to base his parole review decisions on any particular factors. (*Lomax v. Warden* (1999) 356 Md. 569 [741 A.2d 476, 481-483].)

The history of our Supreme Court's parole decisions supports the conclusion that the Board's discretion over parole suitability decisions is neither unlimited nor immune from judicial review. From 1917 through 1976, the Adult Authority (the Board's predecessor) was vested with considerably more discretion over term and parole decisions under the indeterminate sentencing law than the Board now wields under the determinate sentencing law. (See *People v. West* (1999) 70 Cal.App.4th 248, 256-258 [82 Cal.Rptr.2d 549]; *Terhune v. Superior Court, supra,* 65 Cal.App.4th at pp. 873-874; 3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Punishment, § 247, pp. 329-330.) Former Penal Code section 3041, subdivision (a) provided simply that "[i]n any case the matter of parole may be determined by the Adult Authority at any time after the actual commencement of such imprisonment." (Stats. 1963, ch. 1702, § 2, p. 3344; see Historical and Statutory Notes, 51B West's Ann. Pen. Code (2000 ed.) foll. § 3041, p. 415.) Under the former statutes, our Supreme Court recognized that "the decision to grant or deny parole is committed entirely to the judgment and discretion of the Adult Authority," but the court also noted the prisoner's "right . . . to have his application duly considered." (*In re Schoengarth* (1967) 66 Cal.2d 295, 300 [57 Cal.Rptr. 600, 425 P.2d 200].)

When the Adult Authority adopted a policy of denying parole for all prisoners convicted of selling narcotics, the high court ruled that the Authority had violated the spirit and frustrated the purposes of the indeterminate sentencing law, which required "individualized consideration" of each

application. (*In re Minnis* (1972) 7 Cal.3d 639, 645 [102 Cal.Rptr. 749, 498 P.2d 997] (*Minnis*).) The *Minnis* court declared: "This court has traditionally accepted its responsibility to prevent an authority vested with discretion from implementing a policy which would defeat the legislative motive for enacting a system of laws." (*Ibid.*)

The court subsequently noted that its decisions in parole cases "evince[d] a limited cognizance of rights of parole applicants to be free from an arbitrary parole decision, to secure information necessary to prepare for interviews with the Authority, and to something more than mere pro forma consideration. Under time-honored principles of the common law, these incidents of the parole applicant's right to 'due consideration' cannot exist in any practical sense unless there also exists a remedy against their abrogation. (See *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137, 161-163 [2 L.Ed. 60, 68-69].) Hence, our prior recognition of a right to due consideration of parole applications necessarily gives rise to a concomitant right to an available remedy." (*In re Sturm* (1974) 11 Cal.3d 258, 268-269 [113 Cal.Rptr. 361, 521 P.2d 97] (*Sturm*).) The *Sturm* court decided to require the Adult Authority to provide a statement of reasons for its determinations to grant or deny parole, for three reasons: (1) to promote careful decisionmaking by the Authority; (2) to allow inmates to make an informed application for relief; and (3) to facilitate judicial review. (*Id.* at p. 270.)

Thus, our Supreme Court considered judicial review a necessary check against abuse of the Adult Authority's discretionary powers, even at a time when the Legislature had granted the Authority broader discretion than the Board possesses under current law. Insulating the merits of the Board's decisions from judicial review, as the Board urges us to do, would make it impossible to determine whether the Board has given a parole application "due consideration" rather than "mere pro forma consideration." While the separation of powers doctrine prevents a court from "placing the [Board's] decision makers on the stand to inquire into their mental processes," it does not bar the courts from reviewing the Board's parole decisions based on "the record and other admissible evidence in accordance with applicable legal standards." (*Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095, 1100-1101 [97 Cal.Rptr.2d 382].)

What are the applicable standards for reviewing parole release date decisions? The trial court in this case applied the "some evidence" standard employed by Division One of the Second District Court of Appeal in *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, 423-424 [95 Cal.Rptr.2d 279] (*Rosenkrantz*). Though the Board urged the trial court to use the "some evidence" standard below, it now argues that if judicial review of the merits

is permissible at all, proper deference to the Board's authority requires us to apply the "arbitrary and capricious" standard of review. According to the Board, the "some evidence" standard allows improper judicial second-guessing of its discretionary decisions. We agree with the Board that the question of the proper standard of review raises important legal and public policy issues, and merits our consideration for the first time on appeal. (*Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 654-655, fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261]; *Resolution Trust Corp. v. Winslow* (1992) 9 Cal.App.4th 1799, 1810 [12 Cal.Rptr.2d 510].)

*Rosenkrantz* is the first case in which a California court stated a standard for reviewing the factual basis of a parole suitability determination by the Board. The *Rosenkrantz* court derived the "some evidence" standard from *Powell, supra*, 45 Cal.3d 894. (*Rosenkrantz, supra*, 80 Cal.App.4th at pp. 423-424.) *Powell* was a habeas corpus proceeding reviewing the Board's decision to rescind a previously granted parole date, based on psychiatric reports and on Powell's conduct in custody. (*Powell, supra*, 45 Cal.3d at pp. 898-901.) Our Supreme Court noted: "The BPT's discretion in parole matters has been described as 'great' [citation] and 'almost unlimited' [citation]. The BPT's exercise of its broad discretion 'involves the deliberate assessment of a wide variety of individualized factors on a case-by-case basis, and the striking of a balance between the interests of the inmate and of the public.' [Citation.] [¶] Although broad, the board's discretion is not absolute. That discretion, including the discretion to determine whether a parole date should be rescinded, is subject to the prisoner's right to procedural due process. [Citations.] The board's decision must have a factual basis, and may not be based on 'whim, caprice, or rumor.' [Citation.]" (*Id.* at p. 902.)

The *Powell* court agreed with a Court of Appeal holding that "a parole rescission [is] an abuse of discretion only when the authority acted 'without information, fraudulently, or on mere personal caprice.' (*In re Spence* (1974) 36 Cal.App.3d 636, 639-640 [111 Cal.Rptr. 782].)" (*Powell, supra*, 45 Cal.3d at p. 904.) But the court also borrowed the "some evidence" standard from *Superintendent v. Hill* (1985) 472 U.S. 445 [105 S.Ct. 2768, 86 L.Ed.2d 356] (*Hill*), a case involving revocation of an inmate's good time credits. There, the United States Supreme Court concluded that "[t]he fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact. Revocation of good time credit is not comparable to a criminal conviction [citation], and neither the amount of evidence necessary to support such a conviction [citation] nor any other standard greater than some evidence applies in this context." (*Hill, supra*, 472 U.S. at p. 456 [105 S.Ct. at p. 2774].)

Our Supreme Court decided that the same reasoning applies in the context of parole rescission. "A parole date, like a good time credit, is a prospective benefit that is conditioned on the inmate's continued good performance and subject to review and withdrawal for cause by the BPT. While the board cannot rescind a parole date arbitrarily or capriciously, it does not abuse its discretion when it has some basis in fact for its decision. As stated above, the BPT must strike 'a balance between the interests of the inmate and of the public.' [Citation.] If it is to accomplish this delicate task, it must operate with broad discretion and not be 'subject to second-guessing upon review.' [Citation.] Accordingly, we hold that due process requires only that there be some evidence to support a rescission of parole by the BPT." (*Powell, supra,* 45 Cal.3d at p. 904.)

The *Powell* court carefully restricted its holding on the applicable standard of review to parole rescission proceedings. (*Powell, supra,* 45 Cal.3d at pp. 904-905, fn. 10.) Furthermore, the Legislature has never provided policy guidance for the Board's parole rescission determinations comparable to the provisions in Penal Code section 3041 governing the decision to set a parole release date. Nevertheless, we agree with the *Rosencrantz* court that the "some evidence" standard is appropriate for review of parole suitability determinations. On the other hand, we also agree with the Board that such determinations are reviewable for abuse of discretion under the "arbitrary and capricious" standard. The two formulations are not inconsistent, as was implicitly recognized in *Powell, supra,* 45 Cal.3d at page 904. The Board conceded at oral argument in this case that a decision made without any supporting evidence would be arbitrary and capricious. (See *People v. Cluff* (2001) 87 Cal.App.4th 991, 998 [105 Cal.Rptr.2d 80].) It follows that searching the record to determine whether some evidence supports the Board's parole suitability determination is a regular function of deferential review for abuse of discretion.

The United States Supreme Court has made it clear that the "some evidence" standard discussed in *Hill, supra,* 472 U.S. 445, is only one aspect of judicial review for compliance with minimum standards of due process. In *Edwards v. Balisok* (1997) 520 U.S. 641 [117 S.Ct. 1584, 137 L.Ed.2d 906], another good time credits case, the inmate contended the "some evidence" standard was inadequate for reviewing his claim that the hearing officer was biased and had deceitfully deprived him of a chance to present exculpatory evidence. The court held that the scope of judicial review in prison discipline cases is not so cramped. Even the minimum due process standards applied to prison disciplinary hearings "are not so lax as to let stand the decision of a biased hearing officer who dishonestly suppresses evidence of innocence." (*Id.* at p. 647 [117 S.Ct. at p. 1588].) The court explained that the "some

evidence" standard applies only to questions of evidentiary sufficiency. It is an additional requirement of due process, not a substitute for other established due process requirements. (*Id.* at p. 648 [117 S.Ct. at p. 1588].)

Accordingly, were the Board to determine whether inmates are suitable for parole by flipping a coin, it could not insulate its proceedings from judicial correction simply by identifying "some evidence" in the record to support each result. Nor could the Board routinely deny parole for a certain class of prisoners under a blanket policy of the kind condemned in *Minnis, supra*, 7 Cal.3d 639, and shield itself with a case-by-case invocation of the "some evidence" standard.[5]

Judicial oversight must be extensive enough to protect the limited right of parole applicants "to be free from an arbitrary parole decision . . . and to something more than mere pro forma consideration." (*Sturm, supra*, 11 Cal.3d at p. 268.) The courts may properly determine whether the Board's handling of parole applications is consistent with the parole policies established by the Legislature. (*Minnis, supra*, 7 Cal.3d at pp. 646-647.) While courts must give great weight to the Board's interpretation of the parole statutes and regulations, final responsibility for interpreting the law rests with the courts. (*Terhune v. Superior Court, supra*, 65 Cal.App.4th at p. 873.) Courts must not second-guess the Board's evidentiary findings. (*Powell, supra*, 45 Cal.3d at p. 904.) However, it is the proper function of judicial review to ensure that the Board has honored in a "practical sense" the applicant's right to "due consideration." (*Sturm, supra*, 11 Cal.3d at p. 268.) This function is best served by examining the Board's parole suitability rulings under a deferential abuse of discretion standard. The Board's decision should not be disturbed unless it has acted arbitrarily or capriciously. Particular deference must be accorded to the Board's factual determinations, which need only be supported by some evidence.

## 2. Governing Statutes and Regulations

Before turning to the merits, we set out the applicable statutory and regulatory law. Penal Code section 3041 provides, in pertinent part:

"(a) In the case of any prisoner sentenced pursuant to any provision of law, other than [the determinate sentencing law], the Board of Prison Terms

---

[5]Ramirez contends the Board has been following just such a policy of denying parole to all inmates convicted of murder. However, this claim was not asserted in his habeas corpus petition. It was belatedly raised in his denial of the Board's return to the petition, and the supporting evidence he submitted is less than comprehensive. We will not address this argument. Our comments above are intended only as a general description of the scope of the Board's discretion. Such a serious claim of abuse of discretion must be timely raised and adequately supported with evidence, giving the Board a fair chance to respond and the courts a sufficient record to evaluate.

shall meet with each such inmate during the third year of incarceration for the purposes of reviewing the inmate's file, making recommendations, and documenting activities and conduct pertinent to granting or withholding post-conviction credit. One year prior to the inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the Board of Prison Terms shall again meet with the inmate and *shall normally set a parole release date* as provided in Section 3041.5.[6] The release date *shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public,* and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime. . . .

"(b) The panel or board *shall set a release date unless* it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that *consideration of the public safety requires a more lengthy period of incarceration* for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Italics added.)

The Board's regulations for setting parole release dates are found in title 15 of the California Code of Regulations.[7] Section 2401 provides:

"A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing scheduled as provided in Section 2268. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.

"In setting the parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation.

"The terms in this article are guidelines only. The suggested terms serve as the starting point for the board's consideration of each case on an

---

[6]Penal Code section 3041.5 establishes procedural requirements for Board hearings.
[7]Unspecified section references are to these regulations.

individual basis. The board may establish a term above or below the guidelines when warranted and reasons are stated on the record. A prisoner shall not be released before the minimum eligible parole date."

Section 2402 provides:

"(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

"(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

"(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

"(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

"(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

"(C) The victim was abused, defiled or mutilated during or after the offense.

"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

"(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

"(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

"(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

"(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

"(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

"(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

"(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

"(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

"(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

"(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

"(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

"(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

"(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

"(7) Age. The prisoner's present age reduces the probability of recidivism.

"(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

"(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."

Once the Board determines that an inmate is suitable for parole, it proceeds to set a date for the inmate's release, based on numerous factors provided in sections 2403 through 2411.

### 3. *The Board's Decision*

 The Board contends it did not act arbitrarily or capriciously when it denied Ramirez's parole application. It claims that "due consideration" of the application is demonstrated by the references in its decision to the nature of Ramirez's crimes, his previous criminal record, his failure to correct his criminality after spending time in the CYA, his unstable social history, his need for therapy, and his "institutional programming." The Board argues that "some evidence" supported its findings, because the record before it was replete with evidence relating to the factors relied on in the decision. Indeed, parole could properly have been denied based solely on the nature of Ramirez's underlying offense, according to the Board.

Ramirez, on the other hand, contends the Board erred by relying on the nature of his robberies to find that he had displayed a "callous disregard for human suffering." He notes that his life sentence arose from his murder conviction, and his mandatory parole date for even the most aggravated term that might have been imposed for the robberies had long since passed when he appeared before the Board. He claims the murder he committed is among the least atrocious imaginable, and provides no basis for finding him unsuitable for parole. Ramirez observes that the Board's finding on his need for more therapy flies in the face of the psychological reports in the record.

Further, he claims the Board improperly blamed him for the unfortunate circumstances of his childhood and ignored his exemplary behavior while incarcerated.

We reject the contention that the Board should have excluded the robberies from its consideration. The Legislature has provided that the Board may refuse to set a parole release date if "it determines that the gravity of the current convicted offense *or offenses*, or the timing and gravity of *current or past convicted offense or offenses*, is such that consideration of the public safety requires a more lengthy period of incarceration." (Pen. Code, § 3041, subd. (b), italics added.) Thus, the Board is free to consider not only all offenses underlying the inmate's present sentence, but also any earlier convictions. However, Ramirez's claim that his incarceration has become disproportionate to the determinate term prescribed for his robberies carries some weight. The Board cannot ignore the determinate term prescribed for a commitment offense when it considers the gravity of the crime as a factor weighing against a finding of suitability for parole. The Board must make its determination "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." (Pen. Code, § 3041, subd. (a).) Determining what would be a "uniform" term for an inmate serving an indeterminate life term for offenses that include concurrent determinate terms is not an exact science. However, the Board should strive to achieve at least a rough balance between the gravity of the offenses, the time the inmate has served, and the sentences prescribed by law for the commitment offenses.[8]

We agree with the Board that the gravity of the commitment offense or offenses alone *may* be a sufficient basis for denying a parole application, so long as the Board does not fail to consider all other relevant factors. (*In re Seabock* (1983) 140 Cal.App.3d 29, 37-38 [189 Cal.Rptr. 310].) Nevertheless, the circumstances of *any* past offense, even any murder, are not necessarily a sufficient ground for the Board to refuse to set a parole release

[8]In this case, for instance, Ramirez was convicted of second degree murder and robbery. When weighing the seriousness of his criminal conduct to determine whether Ramirez would pose a threat to public safety if paroled, the Board is not free to disregard his 15-year minimum term for murder and the concurrent 7-year terms for robbery. These sentences reflect both a legislative determination of proportionality (Pen. Code, § 1170, subd. (a)(1)), and the trial court's assessment of the seriousness of the offenses. The Board's broad discretion over parole suitability determinations is not a license to recharacterize the commitment offenses as crimes carrying a more severe penalty. (*Rosenkrantz, supra*, 80 Cal.App.4th at p. 425.) Ramirez could have been convicted of first degree felony murder and given 25 years to life. However, the district attorney and the trial court, acting within the guidelines established by the Legislature, approved a commitment for second degree murder. The Board must factor these discretionary judgments by other agencies of the justice system into its determination.

date. All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. (Pen. Code, § 3000, subd. (b)(1).) And the Legislature has clearly expressed its intent that when murderers—who are the great majority of inmates serving indeterminate sentences—approach their minimum eligible parole date, the Board "shall normally set a parole release date." (Pen. Code, § 3041, subd. (a).) The Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.)

■ Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date. In order to comply with the parole policy established by the Legislature in Penal Code section 3041, the Board must weigh the inmate's criminal conduct not against ordinary social norms, but against other instances of the same crime or crimes. This is the approach taken by the Judicial Council sentencing rule providing the criteria for probation determinations. (Cal. Rules of Court, rule 4.414(a)(1).) The Board must also consider the length of time the inmate has served in relation to the terms prescribed by the Legislature for the offenses under consideration, in order to arrive at a "uniform" term as contemplated by Penal Code section 3041, subdivision (a).

■ The parole decision in this case leads us to question seriously whether the Board approached Ramirez's parole application with an appreciation for the proportionality of his sentence or the gravity of the threat he poses to the public *compared with other robbers and murderers.* In the context of second degree murder, Ramirez's offense was not particularly aggravated. Herrera's death was accidental, and he was a crime partner. Were the Board to proceed to set a parole date, these factors would place Ramirez in the lowest category of the matrix provided by the regulations for determining his base term, which would call for 15 to 17 years. (§ 2403, subd. (c).) The robberies, and the fact that Ramirez had earlier brandished his weapon at the bar, were aggravating factors, but not egregious ones compared to other weapons offenses and other armed robberies. Ramirez never fired the weapon, which was unloaded, nor he did harm the robbery victim. He took no active part in the assault on the store clerk perpetrated by Chapa. Furthermore, Ramirez had been in prison for 17 years when he

appeared before the Board. The concurrent aggravated and enhanced 7-year terms he served for the robberies were far behind him.

The facts considered by the Board also included Ramirez's juvenile record and the fighting conviction he suffered after his release from CYA. We do not reweigh the facts for the purpose of determining Ramirez's suitability for parole—that is the Board's function upon remand. Nor can we say the Board's finding on the gravity of Ramirez's commitment offenses, which the Board declared to be the real reason for its decision, was unsupported by "some evidence." We do, however, conclude that the Board's reliance on the nature of these commitment offenses to deny Ramirez parole for the seventh time, nine years after he first became eligible and 17 years after he entered prison, reflects a determination that was arbitrary in the sense that the Board failed to apply the controlling legal principles to the facts before it. (See *In re Cortez* (1971) 6 Cal.3d 78, 85-86 [98 Cal.Rptr. 307, 490 P.2d 819]; *People v. Cluff, supra*, 87 Cal.App.4th at p. 998.)

The Board's finding on Ramirez's need for further therapy is an even more troubling aspect of its decision. The life prisoner evaluation report prepared for the 1999 hearing characterized Ramirez's participation in self-help and therapy programs as consistently outstanding. The clinical psychologist who prepared the psychosocial report for the hearing noted Ramirez's successful participation in numerous substance abuse programs and therapy groups, and concluded that "his psychological issues are in prolonged remission." The psychologist specifically advised the Board that there was no psychiatric ground for denying parole.

On this record, the Board lacked even "some evidence" to support its finding that "[t]he prisoner needs therapy in order to face, discuss, understand and cope with stress in a non-destructive manner. And until progress is made, the prisoner continues to be unpredictable and a threat to others." This finding was an affront not only to Ramirez, whose progress in therapy was undisputedly exemplary, but also to the Department of Corrections, which provided the therapeutic programs and found Ramirez's participation in them to be outstanding. The Board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham. It is not surprising that the trial court regarded the Board's findings with deep suspicion.

We note, also, that while the Board "commended" Ramirez for "doing very well" in custody, its decision failed to reflect consideration of Ramirez's institutional behavior *as a circumstance tending to show his suitability for parole*. This is a factor the Board is required to consider under

the regulations. (§§ 2401, 2402, subd. (d)(9).) Ramirez's outstanding performance in custody was amply supported by the record. While the Board need not recite every factor it considers in a parole hearing, particularly those it finds unpersuasive, its failure to acknowledge that Ramirez's conduct in prison was a circumstance that supported his application is yet another indication of an arbitrary and capricious determination.

For the reasons stated above, we conclude that Ramirez's petition for a writ of habeas corpus was meritorious. ■ However, the trial court erred by making its own evaluations of the evidence before the Board, and by ordering the Board to set a parole date. In deference to the Board's broad discretion over parole suitability decisions, courts should refrain from reweighing the evidence, and should be reluctant to direct a particular result. (*Powell*, *supra*, 45 Cal.3d at p. 904.) The Board must be given every opportunity to lawfully exercise its discretion over Ramirez's parole application.

## DISPOSITION

The trial court's order is reversed. The court is directed to enter an order granting the habeas corpus petition, and requiring the Board to conduct another parole suitability hearing. The court shall order the Board to render a decision conforming with the following guidelines: The Board must consider the gravity and the public safety implications of Ramirez's offenses as they compare with other similar offenses, and in light of the terms prescribed by the Legislature for such offenses. The Board must consider Ramirez's psychological profile as a factor favoring his application for a parole date, unless a new psychological evaluation supports a different conclusion. The Board must also consider Ramirez's work history, educational achievements, and volunteer work in community service during his years in prison as factors supporting his application.

McGuiness, P. J., and Corrigan, J., concurred.